CHARLES P. CURTIS & others, trustees in bankruptcy, *vs.* BOSTON ICE COMPANY.

Suffolk.     October 20, 21, 1920. — January 17, 1921.

Present: RUGG, C. J., DE COURCY, CROSBY, CARROLL, & JENNEY, JJ.

*Contract,* Construction, Performance and breach. *Damages,* For breach of contract. *Evidence,* Competency, Relevancy and materiality, Self-serving. *Practice, Civil,* Exceptions.

A company dealing in milk at wholesale and retail in 1911 made with an ice company a contract, covering a period of five years, providing that the milk company should sell to the ice company during the term all ice, beyond what it needed for itself, harvested upon a pond owned by it, and that, if the ice house of the milk company should be destroyed by fire or its use should be made impracticable, the ice company would sell to the milk company at a stipulated price such ice as it might need for its milk business, not exceeding twenty thousand tons in any year, but that, "if for any reasons or causes beyond" the control of the ice company it "shall be unable to obtain its usual supply of ice, then said ice company shall be under no obligation whatever in any event to supply it to" the milk company. In the summer of 1913, the ice house of the milk company was destroyed by fire and it made demand upon the ice company for ice, which was refused, the ice company contending that, because of the unusual mildness of the preceding winter, it had been unable to obtain its "usual supply of ice." An action was brought against the ice company for breach of the contract, at the trial of which there was evidence warranting findings that, when the contract was made, the ice company knew that ice was necessary in order properly and successfully to carry on the milk business, that unusually mild winters had not been of infrequent occurrence, that the ice company, after it had refused the demand of the milk company, was notified that such refusal would cause "exceptionally large losses, as milk cannot be handled without ice," and that the milk company would expect the defendant "to pay all the damages that may be caused for the want of the same," that the milk company exercised reasonable diligence to procure an equivalent supply of ice from other sources but was unsuccessful, and that it suffered loss much beyond the difference, at the time of the breaches of the contract, between the market price of the ice and that fixed by the contract. *Held,* that

(1) The measure of the damages which the plaintiff was entitled to recover

was the difference between the price of the ice fixed by the contract and the market price at the time or times when the ice ought to have been delivered by the defendant to the milk company;

(2) The contingency, that ice would have disappeared absolutely from the centres of trade so that it could not be obtained at any price, was not reasonably to have been foreseen and could not have been in the contemplation of the parties when the contract was made;

(3) The plaintiff was not entitled to damages for loss from improper pasteurization and cooling of milk and its souring, all caused by lack of ice, or for injuries to business, trade and good will or due to loss of anticipated profits both from the sale of milk and from the sale of ice.

At the trial of the action above described, upon the question of diligence of the defendant in obtaining its usual supply of ice, evidence was admissible relating to the occasional occurrence of a mild winter and as to the time when cutting of ice was commenced and as to the number of men employed.

A letter by the milk company to the defendant, giving notice that "we are having great difficulty in securing ice at any price to take care of our business, and are losing considerable merchandise and trade, which we will expect the . . . ice company pay on account of your refusing to sell us ice as per your contract," was held improperly to have been admitted at the trial above described, because it was self-serving and incompetent.

Exceptions saved by the defendant to the admission in evidence of answers of the president of the defendant on cross-examination, to the effect that he had no recollection of making to any one connected with the milk company any suggestion as to where it might obtain the supply of ice which it needed, and that the ice company could not have supplied the milk company with ice without the purchase of the ice for that purpose, were sustained, the answers not being pertinent to the issue either of liability or of damages, and tending to mislead the jury by suggesting a false standard of liability.

Exceptions by the defendant to the admission of evidence tending to show that the defendant owned a majority of the capital stock of another ice company to which certain ice was sold by it and that yet another ice company, from which the defendant purchased certain ice in 1913, owned a majority of the capital stock of the defendant, which was offered to show the milk company's efforts "to mitigate damages" and because it "bore upon the question of the plaintiff's ability to obtain ice in the market," were sustained, because the evidence did not relate to the question of the defendant's liability or to the question of damages, and was highly prejudicial to the defendant.

In considering whether the admission of certain inadmissible evidence at a trial was prejudicial to an excepting party, the use made of it, by the counsel for the party who introduced it, in his closing argument to the jury may be considered, although no specific exception to such argument was saved.

It appeared that, in the contract above described, it was provided that "the word 'Ice,' as used and defined in . . . [the] agreement, . . . [should] at all times be construed and taken to mean good, usable and merchantable ice, in good quality and condition, and not snow ice." Subject to an exception by the defendant, the plaintiff was allowed to introduce evidence as to the cutting of ice eight inches or more in thickness or any ice that was practicable to handle, and it was *held*, that the defendant was not prejudiced thereby.

The admission, at the trial above described, of evidence as to the possibility of

cutting more ice in years previous to the winter of 1912–1913 was *held* to have been prejudicial error, as. by the contract, the defendant was bound to exercise due diligence only "to obtain its usual supply of ice," and this did not require it to anticipate shortages by cutting an excess of ice in any one year . to provide for an unusual scarcity in succeeding years.

CONTRACT for breach of an agreement in writing in failing to supply to the Boston Condensed Milk Company, whose trustees in bankruptcy were the plaintiffs, ice needed for its business during the summer of the year 1913 and the year 1914. Writ dated December 18, 1915.

In the Superior Court, the action was referred to an auditor and, upon the coming in of his report, was tried before *Fox*, J.

The letter by the president of the milk company to the president of the defendant, dated July 19, 1913, referred to in the opinion, was as follows: "I hereby give you notice that we are having great difficulty in securing ice at any price to take care of our business, and are losing considerable merchandise and trade, which we will expect the Boston Ice Co. pay on account of your refusing to sell us ice as per your contract, made between your company and the Boston Dairy Co., our predecessor."

Other material evidence and exceptions saved by both parties are described in the opinion.

That portion of the closing argument of the counsel for the plaintiffs which related to the evidence on monopoly and stock control which had been admitted subject to objection and exception by the defendant, and which is referred to in the opinion, was as follows:

"In the first place, you have noticed, in considering the respective situations of the parties that we have on one side a dealer in ice, which has a monopoly of that business in and around Boston. It not only has the monopoly of the business in Boston, except in certain wards, but it controls the Independent Ice Company, so called, — why they gave it that name I can't imagine, but perhaps you can, but it is not independent; it is a subsidiary of this company. In turn, it has appeared in evidence here that this defendant is controlled by stock ownership by the American Ice Company, which is — well, what people call the Ice Trust, which carries on the ice business all along the Atlantic seaboard, except in Boston, where it does it through a subsidiary, the defendant in this case.

"Now, the resources of this company in the matter of procuring ice you can see are based not only upon its ability to harvest ice at its own ponds (about sixteen of them which have been mentioned in this case), but it is able, and was in this case, to secure the ice from the American Ice Company at a nominal price.

"That was the situation with regard to the defendant company when the contract was made. It had no competitors in this field, except those I have mentioned in the outlying towns, and none in Boston. . . .

"Now, of course, nobody likes competition. Some of us have to have it. Lawyers have a great deal of competition, but ice companies don't like it. Probably milk companies would like to avoid it, but they can't. The reason for that is clear enough, gentlemen. Almost any farmer can produce milk; keep a cow. There are thousands of farmers, with farms all over New England, where milk is produced. They can sell it to whom they please. The milk contractors cannot control the sources of supply. They cannot prevent other persons from engaging in that business. But the ice dealer, or producer has a peculiar facility for controlling the business. If you can get the control of a pond, nobody else can cut any ice on that pond. You get the ice. I don't suppose that there has been any considerable increase in the number of ponds in Massachusetts or New Hampshire during the past — shall we say five or six thousand years; we don't know. The ponds have been here for a great many years before the first white man came. We hope they will be here after all of us white men have gone, and for many centuries after that. The fellow that gets control of those ponds, then, gets the ice.

"They talk about Graustein [president of the Boston Condensed Milk Company] coming in here dressed like a laborer. He has to labor; that is nothing to be ashamed of. Who is this man that comes in here and tries to condemn him as a liar? He is a fat, sleek gentleman with a diamond ring on his finger; he is the head of a company that has the monopoly of the ice business here, and he has a heart as cold and as hard as the stuff he sells; that is the man that comes in and tries to discredit and contradict Graustein and says that his statements are falsehoods. I leave it to you, gentlemen, which of those two men is telling the truth. Does he contradict him on anything else? . . .

"Now, then, ice in the market was high even during that winter, and the causes of those high prices of course we don't know, but we are dealing here with a defendant which has, as I have said several times, a monopoly. .   ."

In answer to special questions submitted to them, the jury found that the defendant was not unable for causes beyond its control to obtain its usual supply of ice during the winter of 1912–1913, and that the Boston Condensed Milk Company did request the defendant to supply it with ice after January 1, 1914; and found for the plaintiffs in the sum of $20,910. Both parties alleged exceptions.

*W. H. Garland,* (*J. L. Dyer* with him,) for the plaintiffs.

*F. P. Garland,* (*A. Leonard & J. D. Taylor* with him,) for the defendant.

JENNEY, J. The Boston Dairy Company on May 3, 1911, entered into a contract with the defendant, the Boston Ice Company, for the term of five years, whereby the dairy company, during said term, agreed to sell and the ice company to purchase upon fully defined terms and conditions, all the ice harvested by the dairy company into its ice house in the town of Littleton beyond that needed for use in its own milk business. The contract also bound the dairy company to make every effort to cut ice on said pond, and to fill its ice house therewith, but limited its obligation to sell its surplus ice to an amount not exceeding twelve thousand tons in any year. The ice company agreed that if the ice house of the dairy company should be destroyed by fire during the term of the agreement, or so injured thereby that its use would be impracticable, it would sell to the dairy company such ice as it might need for its milk business at $.65 per ton to an amount not exceeding twenty thousand tons in any year. It was further stipulated: "If at any time any or all of the ice houses of said Ice Company, regularly used by it, shall be destroyed by fire, or at any time so injured that said Ice Company shall be unable to use or fill the same in the regular or usual way, so that the supply of ice of said Ice Company shall be decreased, or if for any reasons or causes beyond its control said Ice Company shall be unable to obtain its usual supply of ice, then said Ice Company shall be under no obligation whatever in any event to supply ice to said Dairy Company." The other terms of the contract are not material.

When the contract was made, the dairy company was engaged, chiefly in Boston, in selling dairy products. It continued that business until December, 1911, when the Boston Condensed Milk Company was organized. On or about January 1, 1912, the obligations of the contract, as far as the same remained unexecuted, were "adopted by novation" by that company and by the ice company for an adequate consideration on the part of each.

The ice houses of the milk company, and all the ice stored therein, were destroyed by fire on July 4, 1913. Due notice of this was promptly given to the defendant by the milk company which demanded that the defendant provide it with ice during the remainder of the year in accordance with the quoted provision of the contract. This the defendant refused, basing its objection on the claim that it was not obliged to furnish ice under the contract, because it had been unable to obtain its usual supply of ice by reason of causes beyond its control. This contention was founded on the claim that, because of the unusual and extreme mildness of the weather in the winter of 1912–13, it could not harvest the usual amount of ice, although it had exercised reasonable diligence in attempting to do so. The defendant delivered no ice to the milk company during the next year, and asserted that it was not bound to do so, because no demand was made upon it for ice for that period.

This action was brought by the trustees in bankruptcy of the milk company. There was a verdict for the plaintiffs, and both parties prosecuted exceptions; those of the plaintiffs relate to the measure of damages, and those of the defendant to the admission of evidence. Each bill of exceptions recites that it contains all the evidence material to the questions raised therein. See *McKinley* v. *Warren*, 218 Mass. 310. There is no exception raising the question of the sufficiency of the evidence to warrant a plaintiff's verdict.

The plaintiffs contend that they are entitled to receive compensation, not only for money paid by the milk company for ice in excess of the contract price, but also for loss of business, because the milk company was unable to procure ice in sufficient quantity to keep its milk "in proper and merchantable condition."

The jury could have found that when the contract was made, the defendant knew that ice was necessary in order properly and

successfully to carry on the milk business; and that unusually mild winters had not been of infrequent occurrence.   After refusal of the defendant to provide ice under the contract, the milk company notified the defendant that under the contract it was entitled to a supply of ice for 1913, and that the refusal to furnish it would cause it "exceptionally large losses, as milk cannot be handled without ice," and that it "would expect you [the defendant] to pay all the damages that may be caused for the want of the same."   There was evidence from which it might have been found that the milk company exercised reasonable diligence to procure an equivalent supply of ice from other sources and that it did not succeed in so doing; and that because of this failure, it suffered loss much beyond the difference between the market price of ice and that fixed by the contract.

The plaintiffs requested instructions to the jury which postulated in varying terms their claim that the damages to which they were entitled, if liability were found, should not be limited to the difference between the market and contract prices of ice, because as a proximate and direct consequence of the breach of the contract, the milk company suffered loss far in excess of the amount so determined, and because such damage was, at the time the contract was made, "reasonably to be foreseen."   The requested instructions further sought rulings that the measure of damages could be based on loss from improper pasteurization and cooling of milk, and its souring, all caused by lack of ice, and for "injuries to . . . business, trade and goodwill and due to loss of anticipated profits, both from the sale of milk and from the sale of ice."   The requests were refused subject to the plaintiffs' exceptions.

The rule of damages given to the jury was: "The measure of damages is the loss directly and naturally resulting in the ordinary course of events from the seller's breach of contract.   In the present case the measure of damages is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been delivered.

"There is no authority for the position that a claim for consequential damages for the loss of business, for loss of trade, can be based upon the contention that an article in common use like ice has absolutely disappeared from the centres of trade so it

could not be obtained at any price. Such a contingency could not have been within the contemplation of the parties when the contract was made. .

"You will therefore dismiss from your minds all testimony which has gone in here concerning sour milk, strikes and loss of business of the milk company, and confine yourselves to the rule of damages which I have laid down, — that is, the difference between the contract price and the market price."

The rule of law involved has often been considered and stated. It is so well settled that no necessity arises for its restatement. As was said in *Leavitt* v. *Fiberloid Co.* 196 Mass. 440, 446, "The principle is ancient and familiar. The only difficulty lies in its application." The case quoted contains a full review of Massachusetts authorities and also of many in other jurisdictions. See also *Gagnon* v. *Sperry & Hutchinson Co.* 206 Mass. 547; *John Hetherington & Sons, Ltd.* v. *William Firth Co.* 210 Mass. 8; *Moore Spinning Co.* v. *Boston Ice Co.* 210 Mass. 364; *Randall* v. *Peerless Motor Car Co.* 212 Mass. 352, 380; *Neal* v. *Jefferson,* 212 Mass. 517; *Pipolo* v. *Fred T. Ley & Co. Inc.* 216 Mass. 246; *Dondis* v. *Borden,* 230 Mass. 73.

The vital question is whether the claimed damages were such as reasonably and proximately might have been expected and foreseen from a breach of the contract. The rule must be applied from the standpoint of conditions existing as to both parties at the time when the contract was made. If the loss comes within this principle, and if it can be determined with a reasonable degree of certainty, it may be recovered, but only in case it can be so estimated. *Lowrie* v. *Castle,* 225 Mass. 37, 51, where the authorities are fully cited.

The rule was correctly applied in this case. The contract was made in 1911 between the Boston Dairy Company and the defendant. The dairy company was then "doing a large business in the selling of milk both by wholesale and by retail in Boston and its vicinity." The milk company became a party to the contract by novation on January 1, 1912. The contract did not provide that ice was to be furnished by the defendant except upon the contingency of the destruction of the ice houses then of the dairy company, or their injury by fire so that it would be impossible to use them. Until that happened, the only obliga-

tion in force relating to the sale of ice was that of the dairy company and its successor, the milk company, to sell the ice company its surplus ice, not exceeding twelve thousand tons in any year. Both parties were engaged in harvesting ice. It would be unreasonable to hold that there existed an obligation under which damages to business might be recoverable, unless it was mutual. At the time when the defendant's unjustifiable failure to harvest ice is claimed to have happened, the defendant was under no duty to furnish ice to the milk company and no such obligation arose until July 4, 1913, months after. It could not be properly held that the parties to this contract, containing mutual agreements of sale and purchase of a commodity commonly bought and sold, contemplated when the contract was made, that damages to business and kindred losses should be regarded as arising in the common course of events as a proximate result of its non-performance. Nothing in the terms of the contract, or in the circumstances, so implies.

The instructions given stated the rule as applicable to this case with substantial correctness. The plaintiffs' requests relating to the same questions were rightly refused. Those numbered eight and ten are immaterial, because the plaintiffs had a verdict. The plaintiffs' exceptions are overruled.

All the remaining exceptions were taken by the defendant. Many of them relate to the admission of evidence bearing upon the question of damages. These were not argued, apparently because the jury were instructed to disregard the evidence so admitted, and they must be considered as waived. Similar questions are not likely to arise in another trial of this action.

The exception to the admission of evidence relating to the occasional occurrence of a mild winter is not argued and must be overruled. Evidence of the same purport had already been given, without objection, by the defendant's superintendent, when called as a witness by the plaintiffs. It was competent upon the question of the defendant's diligence in obtaining its usual supply of ice.

The exceptions to evidence as to the time when the cutting of ice was commenced and as to the number of men employed must also be overruled. The evidence was properly admitted as of some probative value upon the issue last stated.

The letter dated July 19, 1913, from the president of the milk company to the president of the defendant, was improperly admitted. It was self-serving, because it stated incompetent elements of claimed damage based on inadmissible evidence. Whatever rule of damages was adopted by the judge, the statements therein contained were of no probative force, and tended to prejudice the defendant, because of the statements of fact and charges of wrongful conduct therein contained. It was not made competent by any connection with previous or subsequent letters or other action of the defendant. *Maloney* v. *Philpot*, 219 Mass. 480. *Kumin* v. *Fine*, 229 Mass. 75. *Wagman* v. *Ziskind*, 234 Mass. 509.

While the president of the defendant company was under examination as a witness called by the plaintiffs, he was thus interrogated in their behalf: "You did n't make any suggestion to Mr. Graustein [president of the dairy company] or anybody connected with his company as to where he might obtain the supply of ice which he says he needed?" He answered, under exception by the defendant, "Not within my recollection." This evidence was not pertinent to the issue of liability, which was merely whether the defendant was by reason of causes beyond its control unable to obtain its usual supply of ice during the winter of 1912–13. It was not material in the determination of the damages sustained, which properly were limited to the difference between the contract and market prices. It was calculated to mislead the jurors by directing their attention to an irrelevant consideration, and to lead them to the belief that such a duty existed, and thereby prejudice them against the defendant. This exception must be sustained.

During the cross-examination of the same witness when recalled by the defendant, this question was asked, subject to exception: "Could you not, after the fire of July 4, have supplied the Boston Condensed Milk Co. with the ice which it needed, assuming the amount was eight thousand tons for the rest of that year, without denying to any customer of yours the amount of ice which he desired for his own consumption?" The answer was, "I could not without the purchase of ice for that purpose." The question was wrongfully admitted for the reasons just stated. It suggested a false standard of liability: and it did not relate in any way to the amount of recovery.

The same witness was interrogated while called by and under examination in behalf of the plaintiffs, "whether the Independent Ice Company, to whom certain ice was sold, was affiliated with the Boston Ice Company. He answered that the Boston Ice Company owned a majority of the shares of stock in the Independent Ice Company. The witness was then asked whether the American Ice Company owned a majority of the stock of the Boston Ice Company. Upon objection the question was excluded at this time." Later he was asked in behalf of the plaintiffs: "Did the American Ice Company, when you made the purchase in 1913 [referring to the purchase of certain ice by the defendant from that company] own a majority of the stock of the Boston Ice Company?" Under exception, he answered, "Yes," and then, subject to further exception, he testified that the American Ice Company owned all of the defendant's capital stock. The plaintiffs argue that this evidence was admissible because it tended to show its efforts "to mitigate damages" and because it "bore upon the question of the plaintiffs' ability to obtain ice in the market." The fallacy of this argument is clear. The evidence did not relate to the defendant's liability, which confessedly was based on its ability to procure its usual supply of ice by cutting, as heretofore more fully stated, and upon its refusal to supply ice in the year following. It was not pertinent to the measure of damages as correctly stated by the trial judge. It did tend to prejudice the defendant, as will appear by reference to the argument addressed to the jury concerning its effect. While no exception was taken to that appeal, it may be referred to in considering the possibility of the claimed effect of this evidence, which prejudiced the substantial rights of the defendant. *Butchers Slaughtering & Melting Association* v. *Boston*, 214 Mass. 254, 259. *Ennis* v. *Wright*, 217 Mass. 40.

The only remaining exceptions relate to the admission of evidence as to the cutting of ice eight inches or more in thickness or any ice that was practicable to handle, and as to the amount of ice which might have been cut in previous years. The contract provided that "the word 'Ice,' as used and defined in . . . [the] agreement, . . . [should] at all times be construed and taken to mean good, usable, and merchantable ice, in good quality and condition, and not snow ice." The admission of evidence as

to the cutting of ice of the thickness stated or referred to did not constitute prejudicial error. The evidence as to the possibility of cutting more ice in previous years was incompetent and the exception to its admission must be sustained. The defendant was bound to exercise due diligence only "to obtain its usual supply of ice." This did not require it, upon the facts in this case, to anticipate shortages, by cutting an excess of ice in any one year to provide for an unusual scarcity in succeeding years.

*Plaintiffs' exceptions overruled.*
*Defendant's exceptions sustained.*