## BRIGHTWATER PAPER CO. v. MONADNOCK PAPER MILLS.

### Civil Action No. 1712.

District Court, D. Massachusetts.

Oct. 22, 1946.

716

Hurlburt, Jones, Hall and Bickford, of Boston, Mass., and Walter J. Donovan, of Adams, Mass. (Damon E. Hall and Philip N. Jones, both of Boston, Mass., of counsel), for plaintiff.

William B. Sleigh, Jr., and Gardner W. Russell, both of Boston, Mass., for defendant.

FORD, District Judge.

This is a suit by the plaintiff, a Delaware corporation, against the defendant Maine corporation, for breach of a series of agreements for the sale by the defendant to the plaintiff of quantities of paper.

A master was appointed to hear this case on November 24, 1942. Hearings were not completed until June 30, 1944. The master filed his report September 17, 1945.

On February 8, 1946, a stipulation was entered into, approved by the court, wherein it was agreed to waive jury trial, that no further evidence was to be offered before the court, aud "the master's report shall be used before the judge at the time of trial in the same manner as though the

case were being tried before a jury." Rule 53 (e) (3), Federal Rules Civil Procedure, 28 U.S.C.A. following section 723c, provides that the findings of a master in jury actions are admissible as evidence of the matters found.

The agreements set out in the plaintiff's declaration (this is a removed case), and which the master found were executed by the parties, consist of a so-called main contract dated November 24, 1939, and also various supplemental contracts made on the same day, and other supplemental agreements made at later dates.

The main contract, dated November 24, 1939, provided, in substance, that the defendant would make and sell paper to the plaintiff upon various conditions and at prices to be provided in supplemental agreements. This contract also set forth restrictions against sales by defendant to the plaintiff's customers and provisions for arbitration of disputes concerning quality and prices. In each of the supplemental contracts the defendant agreed to make and sell to the plaintiff a certain style and grade of paper packed in a certain way at certain prices with certain discounts, commissions and freight allowances and to ship the same to a certain destination. There was also a provision in the supplemental contracts stating that they were in amendment of the main contract. There was also the restrictive provision of the main contract in most of these supplemental contracts that the defendant would not sell to Brightwater's customers the type of paper referred to in the contract. Most of these supplemental contracts showed the defendant the names of plaintiff's customers and lines of paper they bought. Some of these customers were customers of the defendant on other lines of paper, and others had formerly been customers of the defendant. The main contract provided the agreement might be cancelled by either party on six months' written notice to the other.

The first count of the plaintiff's declaration alleges that the written instruments declared on, namely, the main contract of November 24, 1939 and the various supplemental contracts, constituted valid and binding agreements, and that the defendant on April 1, 1941 gave the plaintiff notice of cancellation of the contract dated November 24, 1939, by giving it six months' written notice as provided by the contract. The plaintiff alleged further that the defendant repudiated and breached these contracts by notifying the plaintiff on August 28, 1941 (about a month before expiration of the six months' period), that it would not further comply with the terms and conditions of these contracts and would not manufacture and ship paper to the plaintiff on the plaintiff's orders, and thereafter refused to manufacture and ship paper upon the plaintiff's orders pursuant to the contract.

Count 2 alleges that the instruments declared on constituted offers to sell paper to the plaintiff and that before the offers were revoked by the defendant, the plaintiff, relying on such offers, gave the defendant written orders for the manufacture and delivery of paper but the defendant failed and refused to deliver any of the paper ordered under certain of the orders and delivered a portion only of the paper under other orders.

Count 3 alleges that the plaintiff, between April 1, 1941, and August 27, 1941, ordered certain paper in various amounts and at various prices, that the defendant accepted those orders but refused to manufacture and deliver any of the paper ordered under certain orders and delivered only a portion of the paper ordered under other orders.

All counts are for the same cause of action and the plaintiff claimed general and special damages of various kinds in all counts.

The defendant's answer to the three counts will be dealt with later. The defendant in its answer counterclaimed for the plaintiff's alleged indebtedness to it for paper sold and delivered and not paid for.

The master made many detailed and alternative findings. On Count 1 he found for the plaintiff in the amount of $40,395 with interest from October 17, 1941. It was upon this count that the plaintiff relied primarily. Counts 2 and 3 were added by the plaintiff to cover possible situations

in the event the plaintiff failed on Count 1.

The master made findings on Counts 2 and 3 and also made alternative findings for both parties on all counts. The master found for the defendant on its counterclaim of $47,884.70 with interest on $38,060.32 from October 20, 1941, and on $9,824.38 from November 20, 1941.

The case with its voluminous record of 2825 pages and almost 1000 exhibits presents to the court at the outset, two questions: (1) On what count, if any, can the plaintiff recover and (2) if it can recover, what are its damages?

The defendant contends the plaintiff cannot recover on Count 1 for the reason that the agreements executed by the parties are unenforceable and void for uncertainty, lack of mutuality of obligation, and failure to meet the requirements of the Statute of Frauds as set out in the Sales Act. Further, it contends the plaintiff cannot recover on Count 2 because of the Statute of Frauds and if it is entitled to recover, its damages are limited to the commissions lost on orders for delivery to plaintiff's customers and the difference between the market and contract prices on accepted orders of paper for the plaintiff's own use.

A review of the master's findings, the only evidence in the case, shows that the plaintiff's mill is located at Adams, Massachusetts, and the defendant's mill at Bennington, New Hampshire. The capacity of the defendant's machines was considerably greater than that of the plaintiff's and the capacity of the machines was the bottleneck of the mills. The principal papers involved in this case are sulphite bond of Nos. 1, 2, and 4 grade, "ledger" of Nos. 1 and 2 grade, "Index," "Mimeo" of Nos. 1 and 3 grade, and "papeterie." The plaintiff had certain "mill" watermarks; "Etonian" applied to No. 1 bond, and "Publisher" and "Decade" applied to No. 2 bond. These watermarks appeared usually on No. 1 and at times on No. 2 bond. Among the plaintiff's customers in 1939 was the Courier-Citizen Company, a large printing plant at Lowell, Massachusetts, which bought various lines of paper for its customers, including large quantities of No. 4 bond. The latter company had been buying No. 4 bond and "Index" from the plaintiff since 1938. The plaintiff itself made and sold more papeterie than any other line although it manufactured and sold some "Etonian" No. 1 and "Publisher" and "Decade" No. 2 bond at its own mill. Plaintiff's mill was not adapted to the economical manufacture of No. 4 bond and for some time prior to 1939 the plaintiff had procured this paper from a mill named "Waterfalls." Because of a change of ownership at "Waterfalls," Mr. Henry J. Guild, president of the plaintiff, wanted a new source of supply for No. 4 bond and of certain other lines which had been manufactured at "Waterfalls" and in August or September, 1939, he approached Mr. Henry C. Barr, president of the defendant, with the view of having this paper manufactured by the defendant. At that time business was quiet and the defendant's mill was not running full time. Guild told Barr that Courier-Citizen No. 4 bond business amounted to from 750 to 1000 tons a year. Barr decided it could make this paper at a profit. Guild also told Barr that if the parties entered into a contract, the plaintiff would give this business to the defendant and would turn over other business on which the defendant's profit would be greater than its profit on the Courier-Citizen No. 4 bond. Guild also stated the plaintiff would enlarge its New York office and increase its sales force there.

On November 24, 1939, the defendant signed the main contract and a considerable number of the supplemental contracts. These had previously been signed by the plaintiff.

Before the contracts were signed by the defendant on November 24, 1939, plaintiff had sent orders for No. 3 papeterie, a type of paper more profitable to defendant than No. 4 bond, and Barr, on November 1, sent samples of different weights of No. 4 bond, white and colored, to Courier-Citizen. Also information was sought by the plaintiff and received with respect to defendant's capacity. The plaintiff sent the defendant sample sheets showing its watermarks which it expected to appear on various papers the plaintiff intended to

order. During the negotiations before November 29, the plaintiff hired two extra salesmen at salaries of $6000 and $8000, respectively, and Barr expressed satisfaction with both. One of these salesmen spent most of his time and the other about one-half his time soliciting orders for Monadnock. Neither one of these salesmen spent any time on Courier-Citizen business. In February, of 1940, the plaintiff added another room to its New York office.

During December, of 1939, the plaintiff sent orders for about 177 tons of paper, some of which went to Courier-Citizen. On January 9, 1940, the plaintiff wrote the defendant that the plaintiff had stopped sending orders to "Waterfalls" and the defendant wrote: "I am glad that this is so and would like to say at this time that we can take care of any orders you might have to send to us." During 1940, supplemental contracts were sent by the plaintiff to the defendant, some of which were signed and others not. The last supplemental contract was signed by the defendant on December 3, 1940. Each of the supplemental contracts was identified by a so-called "code" number, and, except for the "S" codes, related to the sales of a particular line of paper, ordinarily for a particular customer of the plaintiff. For example, code "C" designated the several contracts which related to the sale of No. 4 bond for Courier-Citizen; code "S" related to the sale of various types of paper for Brightwater's own stock; and other code numbers related to the plaintiff's customers other than Courier-Citizen. From time to time orders were given by the plaintiff and accepted by the defendant which were not covered by any supplemental contracts.

During 1940, business was moderate, prices stable, and the plaintiff sent orders to the defendant for 2,026,346 pounds of paper, of which 1,287,981 pounds were for Courier-Citizen. These orders were originally sent to Brightwater, which thereupon sent its own orders to Monadnock, giving its own order number, but specifying that the shipment should be marked with the Courier order number.

In 1941, there came a decided change in the picture and the defendant in February and March sought to cancel most of the supplemental contracts. Cancellation agreements were sent to the plaintiff and the plaintiff refused to sign. The plaintiff continued to give orders and the defendant accepted orders on many supplemental contracts. In July and August there was a terrific demand for papers and prices were rising. The market was oversold and in September and October the matter had reached a critical stage.

During the spring and summer of 1941, the defendant's mill was running from 25–27 days a month and the monthly tonnage amounted to about 2,000,000 pounds. The orders given the defendant by the plaintiff for Courier-Citizen ranged from 59,974 pounds in May to 574,263 in August and other orders given ranged from 124,544 pounds in May to 571,248 pounds in August. In April, Courier-Citizen orders were 180,718 pounds and other orders 232,-210 pounds.

Barr wrote Guild on March 10, 1941, that the only accounts "we could be interested in keeping at all are the Lowell Courier-Citizen, and your #2 Bond providing we get some decent tonnage to run on it." During March, 1941, orders showed 382,255 pounds, of which 287,425 pounds were for Courier. This was about 25% of the capacity of the defendant's mill.

On March 31, 1941, the defendant wrote the plaintiff "to notify you of cancellation of our existing contract, to be effective six months from date." After the cancellation notice the parties continued to submit their differences as to prices to be charged to an arbitrator under the provision of the contract's arbitration clause already referred to.

Paragraph 2 of the main contract provided for shipment of all orders within thirty days from the date of orders unless the defendant should extend the time or unless the total tonnage of orders should exceed 500 tons in any one month. In April, May, June, and July orders were in each instance less than 500 tons, yet very few orders given after April 1, 1941 were shipped in full within 30 days of their dates and by the middle of June orders were long overdue. On August 26, 1941

plaintiff wrote defendant asking whether the defendant wanted to renew "your paper contract with us either on the present basis or on any other basis which you care to suggest." On August 27 the defendant wrote the plaintiff that "effective immediately our undertaking to accept orders and to make and sell paper * * * in the document signed by us and dated November 24, 1939 is withdrawn, and we will accept no further orders pursuant thereto. Any orders for paper which you may wish to place with us hereafter will be considered in the ordinary course of business." This letter was sent by Barr after consulting his New York attorneys and was received by plaintiff at Adams, August 28. After this letter of August 27, plaintiff sent defendant five orders only one of which, a Courier order for 10,000 pounds No. 4 bond, was accepted and filled. Barr stated in a letter to plaintiff that he filled this order because "we feel that it was sent out in good faith prior to receipt of our letter of August 27th." On September 25, 1941, Courier started to deal direct with defendant for its No. 4 bond paper and its business in that type of paper from that time on was lost to the plaintiff.

■■ Although Barr had previously accepted unsigned orders from the plaintiff, on August 28 he returned about fifteen such orders to the plaintiff and five others that had already been accepted but, according to Barr, without his authority. The master ruled that the lack of the plaintiff's signature on these orders was immaterial and this court agrees, since there is nothing in the contract that says they shall be signed. The orders were in writing and addressed to the defendant's office at Boston as provided in the main contract. Further, the fifteen orders returned were signed by the plaintiff and returned August 27. The master also found that the five orders that were returned partly on the ground they were not accepted by an authorized person were accepted by one Maynard. The latter had accepted many orders during 1940 and 1941 and the master ruled he had authority to accept orders. The finding and ruling was correct in the light of the evidence.

■ On the evidence outlined, it is apparent that performance under the main and supplemental contracts involves three separate groups of business: (1) The Courier-Citizen business; (2) that of other customers of Brightwater; and (3) Brightwater's orders for its own stock. The nature and extent of the parties' obligations vary with respect to these three classes. The contracts involve the performance of different things at different times. Such a contract is divisible. Badger v. Titcomb, 15 Pick. Mass., 409, 414, 26 Am.Dec. 611. As will appear, the conclusion is reached here that the agreements relating to groups 1 and 2 constitute binding bilateral contracts while those relating to Brightwater's own business are unenforceable.

### The Courier-Citizen business.

■ There does not seem to be any question that Brightwater promised to give and did give to Monadnock all its Courier-Citizen business for No. 4 bond paper. This promise was an inducement to the defendant to enter into the agreements with respect to this business. It is true this promise, operating as consideration, did not appear in the contract, but that was not necessary. De Angelis v. Palladino, 318 Mass. 251, 256, 61 N.E.2d 117; Galvin v. Boston Elevated R. Co., 180 Mass. 587, 589, 62 N.E. 961; Hill v. Whidden, 158 Mass. 267, 274, 33 N.E. 526; Missouri Dist. Telegraph Co. v. Morris & Co., 8 Cir., 243 F. 481, 489; Restatement, Contracts, Sec. 82, Illus. 1, Sec. 240(2); cf. Williston on Contracts, Rev.Ed., Sec. 115B. There was adequate consideration and mutuality between the parties with respect to the Courier-Citizen business. The main and supplemental contracts with respect to this business were valid bilateral agreements.

■ The objection that Courier's contract is unenforceable for uncertainty is untenable. The extent of Brightwater's obligation appears to be sufficiently certain. The plaintiff agreed to buy from Monadnock all of a certain specified type of paper (No. 4 bond) that Courier-Citizen ordered from it. In other words, the plaintiff promised to give whatever No. 4 bond Courier required of plaintiff to the defendant. Such a contract is enforceable even though the amount it would order is not exactly defined. Burgess Sulphite Fibre Co.

v. Broomfield, 180 Mass. 283, 286, 62 N.E. 367; Williston on Contracts, Sec. 104, p. 351. The evidence showed the plaintiff had a reasonable expectancy to receive orders from Courier amounting to 750–1000 tons yearly. These were Courier's actual requirements for No. 4 bond. Cf. Williston on Contracts, Sec. 104A. Courier's requirements were not unlimited and the defendant contracted with knowledge of its requirements.

We now come to the supplemental contracts where the defendant agreed to make and sell to the plaintiff certain types of paper that the plaintiff furnished its customers other than Courier-Citizen. Here, we are confronted with a little different situation than was present with respect to the Courier-Citizen business. This was the business of a more profitable nature than Courier's that plaintiff stated to the defendant it would turn over. At no time before signing the supplemental contracts did the plaintiff state how much of this business it would turn over. Unlike the agreement with respect to Courier's business, there was no express promise to turn over all of it to Monadnock. However, in all the supplemental agreements relating to these customers, the defendant agreed to pay the plaintiff commissions and also expressly promised not to sell direct to the customers named. The express promises of the defendant not to sell direct to the customers and pay the plaintiff commissions if it ordered paper for the customers, implied an obligation on the plaintiff's part not only to use reasonable efforts to solicit business from these customers but also an obligation to turn over all the business it secured from these customers. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214; Williston on Contracts, Sec. 90 and cases; 39 Yale Law Journal, p. 579. Judge Wyzanski, in his memorandum of May 20, 1942, held this view with respect to one of the supplemental contracts in dismissing the defendant's motion that Count 1 failed to state a claim upon which relief could be granted. The fact appeared in evidence that, during the life of the supplemental contracts, at no time did the plaintiff manufacture any paper of the type ordered for these customers, nor was there any evidence the defendant soli-

cited business from them with respect to the type of paper ordered. These facts have considerable bearing in determining the intention of the parties.

These contracts were not unenforceable for uncertainty. Some of the customers in these contracts had been customers of the defendant and others were still customers at the time the supplemental contracts were signed. The supplemental contracts reflected the type of paper ordered. Extended negotiations preceded the signing of these contracts. The facts showed certain contracts were rejected, others accepted. Exact prices were specified. Careful consideration in the selection of Brightwater's customers was given by defendant before signing these contracts. Defendant knew the situation of the parties named in these contracts. Many of these contracts involved the same customer. The defendant knew the extent of plaintiff's sales force. Under the circumstances presented, it is fairly inferable the defendant could estimate with reasonable certainty the nature and extent of Brightwater's business with the customers named in the supplemental contracts. We are dealing here with a business contract and its construction should be based on its own facts and construed in the light of all the circumstances that surrounded its making, including the intention of the parties. Cf. 28 Columbia Law Review, pp. 223, 224, 225; Texas Co. v. Pensacola Maritime Corp., 5 Cir., 279 F. 19, 24 A.L.R. 1336.

We pass to the third class of orders presented in the supplemental contracts, namely, Brightwater's contracts for its own stock. These included orders for "Etonian," "Publisher," and "Decade" bond, papers it manufactured in its own mill and which it continued to manufacture at times while the contracts were in force. With respect to this business the plaintiff assumed no obligation, express or implied, to take any more of those types of paper for its own stock than it saw fit to order. It is well established that such an indefinite obligation is insufficient consideration to constitute an enforceable bilateral contract "since the buyer may refrain from buying at his option and do so without in-

curring legal detriment himself or benefiting the other party." Williston on Contracts, Rev.Ed., Sec. 104, p. 350; Gill v. Richmond Cooperative Ass'n, Inc., 309 Mass. 73, 80, 34 N.E.2d 509.

The question remains whether there can be recovery by Brightwater on the supplemental contracts for its own stock on the remaining counts of the declaration. It is clear the plaintiff cannot recover on Count 2. This count proceeds on the theory that the agreements declared on constituted continuing offers and before revocation, the plaintiff, relying on these offers, accepted the latter by giving the defendant written orders for the manufacture and delivery of paper. There is a fatal weakness in this contention. The contracts nowhere make any reference to ascertainable quantities. The offers are too uncertain and indefinite as to quantity to be the basis of a binding contract. Ashcroft v. Butterworth, 136 Mass. 511, 514; Restatement, Contracts, Sec. 32. The legal effect of these supplemental agreements is that they merely constitute an invitation for offers and no binding contract was effected before acceptance by Monadnock. This is the plaintiff's theory of recovery in Count 3.

Although the defendant relies in its answer on the Statute of Frauds (Mass.Gen.Laws, c. 106, sec. 6), it has not argued this defense in its brief with respect to Count 1. This statute may be satisfied by a memorandum in writing of the contract or sale signed by the parties to be charged or the acceptance and receipt by the buyer of any part of the goods contracted to be sold, or sold, or by part payment. The evidence showed that both parties signed the main contract which made reference to the supplemental agreements to be entered into later. Cf. Restatement, Contracts, Sec. 208, (b) (iii). The plaintiff accepted and received large amounts of the goods sold and made payments for them. The defendant has nothing in this defense to Count 1.

### Damages.

We approach this question in the light of the construction put by this court upon the agreements between the parties. Since the agreements with respect to the Courier-Citizen business and those of other customers of Brightwater constituted valid bilateral contracts, it follows the defendant is liable under Count 1 to the plaintiff for its failure to deliver all Courier and other customers' orders given in accordance with the terms of the contract. The master found, and it was an undisputed fact, that the plaintiff ordered 561,125 pounds of No. 4 bond for Courier-Citizen that the defendant failed to deliver. It also failed to deliver 16,000 pounds of paper ordered for Forbes Lithograph; 8,658 pounds ordered for Brewer Chilcote, and 150,000 pounds ordered for Stevenson. These amounts of paper were all ordered during the life of the contract and irrespective of defendant's objections directed to the fact that some of these orders were unsigned and the claim that certain of them were signed without authority, they were valid and binding as already pointed out.

We now proceed to a determination of the measure of damages for failure to fill the above orders.

By the terms of the supplemental contracts, the plaintiff was to receive a 3% discount and a 5% commission in the Courier and other customers' orders. The defendant contends the plaintiff's damages on Count 1 are limited to commissions lost, while the plaintiff takes the position the measure of damages under Count 1 is the difference between contract and market prices of the paper the defendant failed to deliver.

In the light of the construction put upon the agreements here, viz., that the plaintiff's obligation was to turn over to the defendant all of Courier's No. 4 bond business and the defendant agreed to become the plaintiff's supplier for Courier's and other customers' requirements, it would appear that the plaintiff intended to put the paper to a limited and less advantageous use than selling it in the open market, although there is nothing in the main contract which specifically limits the plaintiff in its use of the paper to be purchased. It could sell it in the open market if it saw fit. There is authority to

the effect that in such a case the buyer's damages would be limited to his actual loss. Cf. Williston on Contracts (Rev.Ed.) Sec. 1386, p. 3877. It is doubtful that Sec. 67 of the Uniform Sales Act was considered in deciding these cases. Cf. Isaacson v. Crean, Sup., 165 N.Y.S. 218. Section 56 (3) of the Mass. Sales Act, Gen.Laws, c. 106, sec. 56 (Sec. 67 of the Uniform Sales Act), which provides that a buyer's "measure of damages, in the absence of special circumstances showing proximate damages of a *greater* amount, shall be the difference between the contract price and the market or current price of the goods at the time when they ought to have been delivered * * *" (emphasis mine), compels the conclusion here that the measure of damages under Count 1 is not the loss of commissions but the difference between the contract and market price. Williston on Contracts, Rev.Ed., Sec. 1386; Uniform Laws Annotated, Book 1, Uniform Sales Act, p. 376.

The question of damages under Count 1, in the view taken here with respect to the construction of the agreements, concerns four groups: (1) Courier-Citizen orders; (2) Brewer Chilcote order No. 6893; (3) Forbes Lithograph order No. 7049; and (4) Stevenson order No. 6979. The master in one of his alternative findings, within the rule as to the measure of damages which this court has determined should be applied for failure to manufacture and deliver Courier-Citizen orders, found the damages to amount to $13,149.44; Brewer Chilcote order $119.89; Forbes Lithograph order $319.83; and Stevenson order $1519.89. These computations of damages are correct in part. There is an excess of $14.61 in the Forbes item and the damages are inadequate on the Stevenson item.

The plaintiff purchased 73,347 pounds of paper from other mills to fill in part the Stevenson order No. 6979. The master found that the plaintiff suffered no damage with respect to this as it purchased it in the market for less than the net contract price in 1942, at a time the market had fallen. The plaintiff contends that it is entitled to the difference between the market price and contract price as of 1941 under the provisions of the Mass. Sales Act, Gen.Laws, c. 106, sec. 56(3). The plaintiff is correct. The Stevenson order, dated August 6, 1941, ought to have been delivered in September of 1941 under the terms of the contract. At least a refusal to deliver took place on October 31 of that year. The difference between market and contract prices should be taken as of the time of delivery, not as of 1942, when plaintiff bought the paper in a fallen market. Cf. Mass. Sales Act, Sec. 56(3). The difference in market and contract prices as of 1941 was found by the master to amount to $1575.80. The plaintiff is entitled to this amount as damages on this item.

On Count 3 where recovery is allowed for accepted orders of the plaintiff to replenish its stock ("Etonian," "Publisher", and "Decade") the master found the damages on the accepted orders amounted to $72.42 for "Etonian," $127.34 for "Publisher", and $526.26 for "Decade." These are correct and make the total damages on Counts 1 and 3 of $17,396.26.

In cases where the plaintiff manufactured paper in place of that ordered of but not supplied by the defendant, plaintiff asks an alternative finding to the one made here that the measure of damages with respect to these orders is the difference between contract and market prices. The plaintiff contends that since its business was chiefly the profitable manufacture of papeterie (it could sell all it could make) and the manufacture of bond papers was unprofitable, it was entitled in these cases to the difference between the contract price and the total manufacturing cost of these papers plus the loss of profits on papeterie. The master made an alternative finding as respects these items where there was evidence presented as to the manufacturing costs and ruled plaintiff was not entitled to the loss of profits on papeterie. In the view taken of the agreements between the parties, we are only concerned with the claimed consequential loss on papeterie with respect to the Forbes Lithograph and Stevenson orders. For both these concerns, the plaintiff manufactured No. 2 bond and white mimeo paper on its own account which the defendant failed to deliver. The manufacturing cost to the plaintiff, the master found, was greater than the contract price and he also

724

found the amount of the loss of profits on papeterie which it would have manufactured had the defendant filled the orders. The difference in costs with the addition of profits lost as a measure of damages was greater than the amount resulting from an application of the contract and market price rule.

As the master ruled, the plaintiff is not entitled to include a manufacturer's profit in determining the cost of the paper which the plaintiff made to take the place of that which the defendant refused to deliver. The losses of profits on papeterie were not manufacturer's costs of the paper made. Further, the master found, and the evidence showed, that Brightwater could have purchased the paper it manufactured for Forbes Lithograph and Stevenson in the open market and the measure of the plaintiff's damages in such a case, and applied here, is the difference between the market and contract price, absent special circumstances showing greater proximate damages. Cf. c. 106, sec. 56(3) Mass. Gen.Laws. Here, it is apparent the claimed loss of profit is not the loss of profit on the subject matter of the contract and necessarily is not a proximate loss and, furthermore, the loss claimed was not in the contemplation of the parties at the time of the making of the contract. Assuming, arguendo, there was no available market and sec. 56(2) of the Massachusetts Sales Act is applicable, the result is the same, because there is no evidence in the master's report that would indicate that either party to the contract of 1939 had reason to foresee the market conditions in 1941 that would cause paper of the type that was not delivered to be unpurchaseable, or that this particular remote loss of profits would result. Curtis v. Boston Ice Co., 237 Mass. 343, 350, 129 N.E. 444; Restatement, Contracts, Sec. 330.

The plaintiff asks an alternative finding of damages for office expenses, salaries and traveling expenses for the two employees Simpson and Maglathlin. It seeks this finding if the loss of profits on papeterie is disallowed. We have already seen defendant, as a matter of law, was not entitled to the loss of profits on papeterie. It is difficult to see how the finding sought is alternative. Furthermore, the plaintiff is not in the position of a party who is unable to establish with certainty any basis for damages. Cf. Williston on Contracts, Rev.Ed., Sec. 1363A, p. 3827. The plaintiff has been awarded damages that put it in the same position as if the defendant had carried out its terms of the contract.

The Counterclaim.

The amount, $47,884.70, is not in dispute. The plaintiff contends that since the defendant repudiated the contract on August 28, 1941, it is not entitled to recover either on the contract or in quantum meruit. The plaintiff argues the contract between the parties is an entire contract and a breach by the defendant excuses the plaintiff from all obligations under it. The error in this is that the contracts as stated above, are not entire contracts but divisible; they provide for deliveries at different times, deliveries to be paid for separately. Such a contract is divisible. Mark v. Stuart-Howland Co., 226 Mass. 35, 43, 115 N.E. 42, 2 A.L.R. 678; Barlow Manufacturing Co. v. Stone, 200 Mass. 158, 160, 86 N.E. 306; Restatement, Contracts, Sec. 266(3) and Comment (e); Williston on Contracts, Rev.Ed., sections 861, 871. Even an entire contract may be divisible if the performances under the contract can be divided into different groups, each set embracing performances which are the agreed exchange for each other. Bianchi Bros. Inc. v. Gendron, 292 Mass. 438, 445, 198 N.E. 767, 107 A.L.R. 953. The defendant recovers on its counterclaim with interest on $38,060.32 from October 20, 1941, and on $9,824.38 from November 20, 1941.

Interest to plaintiff on $17,396.26 from October 17, 1941.

Judgment accordingly.