James LOWENSTERN
v.
STOP & SHOP, d/b/a BRADLEES

No. 79-6792

Superior Court
Commonwealth of Massachusetts

October 21, 1981

**Thomas Waldstein,** counsel for plaintiff
**Newton Levee,** counsel for defendant
**Gerald Brecher,** counsel for defendant

## MEMORANDUM OF DECISION

Plaintiff brings this action claiming defendant's refusal on April 4, 1979, to honor a number of "rain checks" held by plaintiff caused plaintiff's business to collapse. Plaintiff cast his original complaint as a breach of a contract suit for the difference between the price on the rain check and the average selling price, or $2459.28. By amendment thereafter, plaintiff added a Count II based on G.L. c. 93A, alleging unfair and deceptive trade practices.

Defendant denied the relevant allegations, alleging as a counterclaim that plaintiff purchased merchandise by means of "rain checks" through fraud, deceit and misrepresentation, and, by amended second counterclaim, the plaintiff was guilty of unfair methods of competition and unfair or deceptive trade practices contrary to G.L. c. 93A. Defendant in its amended answer alleged that the rain checks had been revoked prior to April 4, 1979, were not valid after three months maximum, and that plaintiff, alleging himself to be a consumer, failed, at least thirty (30) days prior to the filing of his action, to make a written demand for relief on defendant pursuant to G.L. c. 93A, § 9.

The action was instituted in the First District Court of Southern Middlesex, Small Claims, on May 21, 1979, transferred to its regular Civil Docket on June 13, 1979, and removed to this Court on December 28, 1979, after plaintiff's amended complaint under G.L. c. 93A.

The case was submitted on agreed Exhibits 1, 2, 3, 4 and 5 and on testimony on behalf of plaintiff, from plaintiff and his present wife, formerly Jodi Webber, and for defendant on testimony of Tina Kingston, Debbie Steacie, Rose Dauer, Robert Brenner, Paul Kane and Linda Ricci.

The case was briefed and argued by counsel. The Court makes the following:

## FINDINGS OF FACT

1. Defendant Stop & Shop Companies, Inc. operates a number of retail general merchandise stores throughout greater Boston under the name of Bradlees.

2. Bradlees advertises broadly its sale items through newspaper circulars and newspaper ads.

3. Bradlees has had for many years a policy of "rain checks"; i.e., if during the life of the circular or ads the supply runs out, the customer is issued a rain check including his name, telephone number, the date, sale price, quantity and item sought, signed by an agent of the store, which he can later present to the store at the sale price. See Exhibit 1.

4. Bradlees during the years in question had a policy applicable to all its stores with respect to solicitations by charities, that they should be referred to the management in the store, whether seeking cash contributions or merchandise, Exhibit 6.

5. The Framingham Bradlees opened in 1975. The policy established by its manager, with respect to rain checks, was that there could be a maximum of 25 of the items sought without special approval by the management of the store.

6. Plaintiff James Lowenstern, now 26, in December, 1977, noting that Bradlees' prices on popular records were substantially below average retail market, conceived the idea of going into a wholesale record business, buying records from Bradlees and reselling them to retail stores, making a profit of his own. He called his business Geodisc, operating from his home in Ashland.

### A. Plaintiff's Business through 1978.

7. Plaintiff made his first purchase from Bradlees in December, 1977, in the

amount of $323.17, see Exhibit 4 and analysis of Exhibit 4 marked Exhibit C for identification, a copy annexed hereto.

8. In January, 1978, plaintiff purchased $204.60 from Bradlees of a total of purchases of $3159.90, and made his first sales that month of $1750.19. See Exhibit 4.

9. I infer that these purchases were made at the Woburn Bradlees store and that some records which plaintiff wanted were out of stock and plaintiff then obtained two rain checks for 20 copies of each of the two records at a price of $3.88. See Exhibits 1E and C.

10. In February, 1978, plaintiff purchased no records from Bradlees, but $2933.88 from other sources and sold $2044.16.

11. In March, 1978, plaintiff bought $684.42 from Bradlees of a total purchase of $2320.89, and sold $2201.87. See Exhibit 4 and attached Exhibit C.

12. In April, May and June of 1978 plaintiff made no purchases from Bradlees but bought respectively $452.19, $548.05, $2213.06 from other suppliers and sold, respectively, $1649.90, $910.68 and $1153.19. See Exhibit C, annexed.

13. In July, 1978, plaintiff bought from Bradlees $30.84 of $1319.99 purchases and sold $1614.84, Exhibit 4 and C.

14. Meanwhile on January 4, 1978, plaintiff obtained rain checks from the Watertown Bradlees for 115 of one record and 25 of another, both for $3.66. See Exhibit 1 and summary adopted from Exhibit B, **id.,** annexed (the dates on which counsel agreed were correct, though different in some cases from those on the rain checks, Exhibit 1).

15. The December, 1977, purchases were made by four checks dated December 3, 27, 29 and 30. See Exhibits 2C, D and F. See also tabulation of plaintiff's checks marked A for identification, copy annexed.

16. Plaintiff's first visit to the Framingham Bradlees appears to have been on February 18, 1978. I infer they were out of the records he sought and he obtained two rain checks, one for 11 records and the other for 15 records, both at $3.66. See Exhibits 1F and G, and B annexed.

17. On March 4, 1978, defendant also went to the Dedham Bradlees and got rain checks for 21 copies of one record and 64 of another, both at $3.66. See Exhibits 1H and I, and B annexed.

18. On July 6, 1978, at Framingham plaintiff obtained a rain check for 86 copies of a record at $3.88. See Exhibits 1A and B annexed.

19. The total purchases from Bradlees through 1978 were $919.86 of a total overall purchase of $26,220.35 and total sales of $21,686.03. See C annexed.

20. Plaintiff never sought to redeem any of the foregoing rain checks.

## B. Events in 2/79.

21. On February 19, 1979, plaintiff and his fiancee Jodi Webber went to the Framingham Bradlees and sought to buy from Rose Dauer, a clerk at the record department, 35 copies of a sale record for a total of $115.00. This would have had the result of cleaning out the entire stock. Dauer complained that the store would not be left with any for any other customer. Plaintiff persisted. Rose Dauer called the manager of the record department, Robert Brenner.

22. Brenner told plaintiffs that the store had to limit the sale in order to have some for other customers. Plaintiff told Brenner that he was buying for a nonprofit charitable organization for orphans. When Brenner asked plaintiff for identification connecting him with the charity, plaintiff said he wanted to keep it quiet so no one would know about it. Brenner said plaintiff could buy 20, which would leave only 6 for other customers, and that if in the future plaintiff produced evidence he was acting for a charity he, Brenner, would try to help him, but that the store would not allow

plaintiff to purchase such large amounts as plaintiff wished in the future. Linda Ricci, Assistant Store Manager, was present during part of this conversation.

23. Jodi Webber (now plaintiff's wife) was in the relevant years also in the retail record business in Ashland, under the name Loch-Ness.

24. I find that defendant did not rely on plaintiff's or Jodi Webber's false misrepresentations that they were acting for the benefit of a charity. I find that defendants disbelieved this allegation.

25. I infer that Brenner intended to convey, and plaintiff and Jodi Webber understood, that Brenner would not allow plaintiff to buy more than 20 of any sale record in the future, without proof of representing a charity, whether by cash sale or rain check.

26. Nevertheless, on the same day after leaving Brenner, I infer plaintiff or Jodi Webber, as agent for plaintiff, managed to buy $218.88 worth of records (see Exhibit 4, pencil entries for 2/79) probably about 55 records at about $3.90, and Jodi Webber went to the service desk and obtained rain checks for 100, 85, 100 and 100 records from Tina Kingston, saying they were for charity. See Exhibit 1J, 1K, 1L, 7 and B annexed.

27. Moreover, on 2/24/79 plaintiff bought $192.00 of records from Bradlees (see Exhibit 4, pencil entries for 2/79) which I infer was probably about 50 records at about $3.90, or more than the limit set by Brenner without proof of representing a charity.

28. Plaintiff's total purchases in 2/79 from Bradlees was $432.36 of total purchases of $3133.12, Exhibit 4, and C annexed.

## C. Events in 3/79

29. In 3/79, plaintiff bought no records from Bradlees, but on 3/20/79 obtained a rain check for 100 copies of "Doobie Brothers," and on 3/24/79, using a false name "Jim Lowe," intending to circum-vent Brenner's limitations and conditions, obtained 4 rain checks signed by D. Steacie for:

50 Pointer Sisters — Exhibit 1N
100 Dire Straits — Exhibit 1O
50 Doobie Brothers — Exhibit 1P
50 Eddie Money — Exhibit 1Q
TOTAL: 250 — All at $3.94.

30. Debbie Steacie asked the plaintiff what they were for and plaintiff replied for a charity. Steacie asked the question from curiosity and would have given plaintiff the rain checks if he gave some other plausible answer.

31. Plaintiff's 3/79 purchases totalled $3132.79.

32. For the remaining activity in plaintiff's business during 1979, see Exhibit C attached.

## D. Events in 4/79.

33. The Framingham Bradlees had a system whereby copies of summaries of the rain checks would be examined and what seemed to be amounts over the policy of 25 maximum were called to the attention of the manager. I infer the 3/24 rain checks were called to the attention of the manager.

34. On April 2, 1979, Paul Kane, manager of the Framingham store, called the number shown on the 3/24 rain checks, and asked to speak to "Jim Lowe." Plaintiff said he was "Jim Lowe." Kane told plaintiff that he was the manager of the store and that the rain checks issued the week before would have to be limited as to quantity. Plaintiff protested and denied Kane's right so to limit his purchases. Kane asked plaintiff if he was a dealer, and plaintiff conceded he was. Kane said that Bradlees were not wholesalers, that they would honor the rain checks for six or so only. Plaintiff threatened to sue.

35. On April 4, 1979, plaintiff appeared at the Framingham Bradlees and sought to buy 75 copies of records, including 20 copies of Dire Straits and Doobie Brothers, on the 3/24 rain checks, Ex-

hibits 1O and 1P. The assistant manager Ricci was summoned to the scene. She remembered plaintiff from February 19, 1979. A female supervisor asked Ricci whether or not it was all right to let plaintiff and Jodi Webber buy all these records. Plaintiff said that he had a rain check to cover that amount. Ricci told plaintiff and Jodi Webber that they could not honor the rain check in that amount because Paul Kane had instructed her not to do so, and that Bradlees would not honor the rain checks any more. Plaintiff had prepared a check in the amount of $78.80 (which I infer was for the 20 records at $3.94). Counsel stipulated during argument that the check, Exhibit 2J, had been produced at trial by plaintiff, from which I infer that while he tendered it to Bradlees, it was not accepted.

36. I infer that plaintiff never returned to the store after April 4. This was because he had been told that his rain checks would no longer be honored, at least above 20 of any single record.

37. I find that plaintiff had no intention of attempting to redeem the February, 1979 rain checks, because his pattern was to redeem them within about a month of obtaining them. (A fortiori, plaintiff had no intention of seeking to redeem the 1978 rain checks).

38. As a result of the limitation on plaintiff's purchases, he did not fill some sales available to him in April, 1979, although he could have replaced the records Bradlees refused to sell him for an additional $50.00.

39. Plaintiff's profit margin on the Bradlees records was fifteen percent (15%).

40. I discredit plaintiff's testimony that the cutting off of his source of supply at Bradlees ruined his business. His total purchases from Bradlees during 1978 and 1979 were $1688.91 of the total of $44,640.87 and sales close to the latter amount, see C, annexed. Purchases from Bradlees were sporadic and bore no rela-

tionship to plaintiff's sales. His maximum sales, in fact, were in April, 1979. His worst month up until July, 1979, was February, 1979, before there was any difficulty with Bradlees.

41. I find that plaintiff and his wife manipulated their books and records to throw profits and losses wherever it suited their fancy.

## LEGAL PRINCIPLES

### 1. Contract Claims

Plaintiff contends that Bradlees could not limit its sale items currently in stock and that rain checks issued when the stock was depleted were binding contracts. Defendant breached these contracts, plaintiff argues, when it refused to sell all the records in stock to plaintiff and refused to honor rain checks plaintiff sought to redeem. Both these arguments are without merit.

### A. Cash Sales

Bradlees' advertisement of its record sales constitutes merely an invitation to enter negotiations. See, e.g., Anderson, Uniform Commercial Code, § 2-204:17 (1970); Montgomery Ward and Co. v. Johnson, 209 Mass. 89, 91 (1911) (circular is an invitation to receive proposals for sale); Cannavino and Shea, Inc. v. Water Works Supply Corp., 361 Mass. 363, 366 (1972). Plaintiff's cash purchases, including those of February 19, 1979, were completed and performed contracts and present no issue for this Court. Furthermore, the clear pattern that emerged from plaintiff's purchases by redeeming rain checks was that he presented rain checks within approximately one month of their issuance. Plaintiff thus never intended to present rain checks issued in 1978, nor, I found, those obtained on February 19, 1979. Consequently, no breach occurred with respect to any of those rain checks.

The records on the shelf are mere of-

fers to retail purchasers with a contract created only upon tender of the purchase price. It is well settled that prior to acceptance an offer may be revoked. **Onanian v. Leggat,** 2 Mass. App. 623, 630 (1974). Therefore, under traditional contract doctrine, Bradlees could rightfully limit the plaintiff's cash sales.

## B. Rain Checks

A contract arises when two parties have a "meeting of the minds" which creates an obligation supported by consideration. **Dartmouth College v. Woodward,** 4 Wheat. 518 (1819); **Thibeault v. Pickering,** 2 Mass. App. 421 (1974); G.L. c. 106, § 1-201(11). Even though defendant did not indicate in its advertisements or circulars that sale items would be in limited quantities, nor that dealers were not invited, I infer it was impliedly understood by both parties to this case that Bradlees was not in the business of supplying wholesalers, that the sales were intended for ordinary customers and that the rain checks were similarly so intended. Consequently, no meeting of the minds occurred with respect to the rain checks and no contract could have been created.

Even putting aside the subjective intent of the parties and considering the rain checks as objective evidence of the parties' understanding, however, none of the other theories advanced by the plaintiff result in the conclusion that the rain checks themselves constitute a binding contract.

I interpret rain checks as offers. While there is no Massachusetts case law directly on point, one case from another jurisdiction, **Weaver v. J.C. Penney Co., Inc.,** 53 Ohio App. 2d 165, 372 N.E. 2d 633 (1977), interprets rain checks as offers.

A rain check could not be a bilateral contract because plaintiff never promised to redeem them. Rain checks thus lack the mutual consideration required for formation of any type of contract.

**Graphic Art Finishers, Inc. v. Boston Redevelopment Authority,** 357 Mass. 40, 42-43 (1970).

Plaintiff next compares the rain checks to a requirements contract, relying on the **Uniform Commercial Code,** G.L. c. 106, § 2-306, and arguing that the defendant was obliged to satisfy all of plaintiff's requirements for the records in dispute. I disagree.

G.L. c. 106, § 2-306, provides in relevant part that: "(a) term which measures the quantity by the ... requirements of the buyer means such actual output or requirements as may occur in good faith except that no quantity unreasonably disproportionate to any ... normal or otherwise comparable prior output or requirements may be ... demanded."

Requirements contracts require that "the party who will determine quantity ... operate ... in good faith and according to commercial standards of fair dealing in the trade so that his output or requirements will approximate a reasonably foreseeable figure." Comment (2) to G.L. c. 106, §2-306. Defendant could not reasonably foresee any demands which plaintiff sought to impose. I also find that plaintiff was not acting in good faith in this context; he deceived defendant as to his identity, purpose, methods and quantities that he might choose to redeem.

Another element of a requirements contract is "honest purpose." **Quincy Oil Co. v. Sylvester,** 238 Mass. 95, 97 (1921) (honest purpose, fair protection of the legitimate interest of the party and amounts not so large as to interfere with the interests of the public). In light of the implied understanding that Bradlees sold to retail customers, I find that plaintiff's purpose was not an honest one.

Finally, in **Neofotistos v. Harvard Brewing Co.,** 341 Mass. 684 (1961), the court found in all requirements contracts an implied mutual promise to deal exclusively with each other. Plaintiff at no time undertook such an obligation; the

evidence indicated that he had other sources of supply.

Plaintiff introduced no evidence of a writing indicating that defendant was obligated to satisfy plaintiff's requirements. See, **Manual on Uniform Commercial Code,** 25 Mass. Prac. § 2.36 (Stickells & Everberg); "Requirements contracts: Problems of Drafting and Construction," 78 **Harv. L. Rev.** 1212 (1965).

Plaintiff further claims that even if I find that the rain checks do not create a binding contract, that the doctrine of promissory estoppel obligates the defendants to pay damages, and cites **Loranger Const. Corp. v. E.F. Hauserman Co.,** 376 Mass. 757, 760-761 (1978). However, the Supreme Judicial Court did not explicitly adopt the doctrine of promissory estoppel in that case. But, even if I were to apply promissory estoppel theories to this situation, the plaintiff's claim must fail. "The idea of reliance on a promise presupposes that the person who has relied on a promise has been induced to some actions which, but for the promise, he would not have taken." **Tully v. Mister Donut Dev. Corp.,** 1979 Mass. App. Ct. Adv. Sh. 1023, 1030. Plaintiff cannot claim reasonable reliance on the rain checks where he received actual notice that they were limited to 20 copies of a single album.

## C. Firm Offer

Once a customer attempts to purchase a sale item and instead is given a rain check, the rain check may become a "firm offer" under the **Uniform Commercial Code.** G.L. c. 106, § 2-205, provides: "(a)n offer by a merchant to ... sell goods in a signed writing which by its terms gives assurance that it will be held open is not revocable, for lack of consideration, during the time stated or if no time is stated for a reasonable time, but in no event may such period of irrevocability exceed three months ..." The rain checks at issue fulfilled the requirements for a firm offer because they (1) were made by a merchant; (2) state that the offer will be kept open ("(t)his rain check will entitle you to purchase the item at today's advertised sale price"); (3) were in writing, and (4) the signature of a Bradlees employee appears on each rain check. Consequently, the rain checks were not revocable for a reasonable time after their issuance, not to exceed three months.

The rain checks in the plaintiff's possession dated in 1978 were not redeemed and were therefore stale and properly revocable by the defendant. I consider the time period from March 20, 1979, to April 4, 1979, to be within a reasonable period and thus not revocable under G.L. c. 106, § 2-205.

However, on February 19, 1979, the manager of the record department informed plaintiff that rain checks for over 20 copies of records would not be honored. Therefore, plaintiff was notified before he and Jodi Weber obtained rain checks on that date, that the offer had been revoked. Plaintiff was thus not entitled to any more than 20 copies of any single record on April 4, 1979, when he attempted to redeem rain checks for 75 records. No evidence was introduced that plaintiff attempted or intended to redeem any further rain checks after April 4, 1979. Plaintiff's books and records show that he had many other suppliers and it would be too speculative to infer such intention.

## D. Agency

Another question as to the rain checks given after plaintiff had notification of their limitation, is whether the sales clerk who issued the rain checks in amounts greater than 20 to "Jodi Webber" and "Jim Lowe" had authority to issue them and so bind Bradlees. An agent's authority is a question of fact. Authority may be actual or apparent.

Actual authority, either express or implied, derives from the principal's

manifestations of consent to act. Restatement (Second) of Agency, § 7. Actual authority binds the principal even if the agent and third party are unaware of the principal's instructions or if the principal has withdrawn his consent without notice to the agent. "If, however, the third person has notice of such error or withdrawal, the agent has no power to bond the principal to him, although the agent, if without notice, is privileged to deal with him." **Id.** at § 7, Comment d. "An agent's authority depends on whether the circumstances are such as to warrant persons dealing with him, in the exercise of · reasonable prudence and discretion, to believe he has authority to represent the alleged principal in regard to the transaction in question." **Contonis v. Medford Housing Authority,** 343 Mass. 108, 113 (1961), quoting **Lord v. Lowell Institute for Savings,** 304 Mass. 212, 214 (1939).

Similarly, apparent authority exists only to the extent third parties reasonably believe the agent is authorized. See, Restatement (Second) of Agency, § 8, Comment c., § 7. A third person "cannot set up an apparent authority unless he relied on it when he entered into the transaction ..." **Commercial Credit Corp. v. Stan Cross Buick, Inc.,** 343 Mass. 622, 626 (1962), quoting **Essex County Acceptance Corp. v. Pierce-Arrow Sales Co. of Boston,** 288 Mass. 270, 276 (1934). See also, **Weisman v. Saetz,** 1981 Mass. App. Ct. Adv. Sh. 430. "One dealing with an agent with knowledge of limitations on the agent's authority cannot hold the principal for acts of the agent outside those limitations." **Howard v. Barnstable County National Bank,** 291 Mass. 131, 137 (1935).

Where the plaintiff received actual notice that rain checks for over 20 records would not be honored by Bradlees, he could not reasonably rely on the rain checks for more than that amount. He knew the agents at the service desk, including Tina Kingston, no longer had actual authority, and it was not reasonable for him to rely on apparent authority. Therefore, the rain checks obtained after receiving notice on February 19, 1979, were not authorized by Bradlees in amounts greater than 20.

Finally, Jodi Webber, as plaintiff's agent, failed to disclose the existence of her principal to the sales clerk when she requested the rain checks. I infer that Jodi Webber obtained the rain checks in her name without disclosing the fact that she was under the direction of the plaintiff for the purpose of circumventing the limitations placed on plaintiff's ability to obtain rain checks. "If the agent knows that the other party would not enter into transactions with the principal, his failure to disclose the existence of the principal may be such misleading conduct that a court of equity or a court of law acting with equity powers may grant rescission or other relief." Restatement (Second) of Agency, §304, Comment (a). This misrepresentation applies to all subsequent rain checks since the plaintiff did not thereafter disclose his identity when obtaining rain checks. Therefore, the rain checks obtained after February 19, 1979, did not bind defendant.

## 2. G.L. c. 93A Claim

Plaintiff also alleges that the defendant's refusal to honor plaintiff's rain checks constituted an unfair or deceptive practice prohibited by G.L. c. 93A and regulations of the Attorney General, XV-C, 940 Code Mass. Regs. 3.02 (false advertising), 3.13 (deceptive pricing) and 3.16(1) (oppressive and unconscionable acts) (1976). In reply, defendant denies that its actions were unfair or deceptive and claims, in addition, that plaintiff's deceptive acts violated G.L. c. 93A. I do not find the defendant's actions to fall to the level of "immoral, unethical, oppressive or unscrupulous" or "within any established concept of unfairness." **PMP Assocs., Inc. v. Globe**

**Newspaper Co.,** 366 Mass. 593, 596 (1975); See, **Anno:** "Scope and Exemptions of State Deceptive Trade Practice and Consumer Protection Acts," Donald M. Zupanec, 89 A.L.R. 3d 399 (1979). The Attorney General defines false advertising as an "advertisement containing an offer to sell ... when the offer is not a bona fide effort to sell ..." Regulations of the Attorney General, XV-C, 940 Code Mass. Regs. 3.02(1). There is no regulation in Massachusetts specifically governing rain checks. In **Weaver v. J.C. Penney Co., Inc., supra,** under the Ohio Consumer Sales Practice Act, c. 1345 **et seq.,** rule COcp 3-01-03 (A)(2)(d), one example of actions construed not to be bona fide offers to sell was: "the failure to give rain checks to consumers after the original quantity of goods is exhausted or the refusal to take orders for the advertised price to be delivered within a reasonable period of time, unless the supplier has clearly and adequately disclosed the specific quantity of advertised goods or services available ..." The Court there held that stores that print advertisements which fail to state the specific quantity of goods available must give customers rain checks when stock is sold out. The consumer in that case sought to purchase one waffle iron. That case is radically different from the case now before the Court.

Indeed, Mass. Reg. 3.02(3)(c) requires defendant to have "a sufficient quantity ... to meet reasonably anticipated demands." I find it had such quantities and that its limitation on quantities to plaintiff was a reasonable one to preserve some for other customers who, had plaintiff cleaned out the whole supply, could have lodged 93A claims against defendant.

I find that Bradlees' practice of limiting large quantities of records to be purchased with rain checks not to be a "deceptive use of a loss leader" since it was not "sold in combination with the purchase of other merchandise ..." Regulations of the Attorney General, XV-C, 940 Code Mass. Regs. 3.13(c). Finally, these actions were not "oppressive or otherwise unconscionable ..." Regulations of the Attorney General, XV-C, 940 Code Mass. Regs. 3.16(3).

Plaintiff's acts such as misrepresenting his identity; employing Jodi Webber to deceive defendant; making false representations that he was acting for charity; obtaining rain checks in large quantities after he had been told that the store would not honor them were unfair or deceptive acts. However, this did not cause defendant to suffer any loss as a result. Defendant, therefore, suffered no damage.

### 3. Conclusion

Bradlees could revoke or limit in advance the authority of its agents to make offers to plaintiff through rain checks, and the events of February 19, 1979 had the effect of limiting any further sales, by cash or rain check, to a total of 20 copies of any record. Nevertheless, on April 4, 1979 defendant should have sold plaintiff 20 copies each of the 4 records on which plaintiff held rain checks; or a total of 80 records at $3.94 or a total of $315.20, on which plaintiff's fifteen percent (15%) profit would have been $47.28.

Plaintiff had a duty, in any event, to mitigate his damages and could have bought the records elsewhere for $50 more but did not. Since his damages were less than $50, the point is academic.

### ORDER FOR JUDGMENT

Judgment should enter for plaintiff for $47.28 plus interest and costs. Judgment for plaintiff on defendant's counterclaim.

**Robert J. Hallisey**
**Justice of the Superior Court**

## EXHIBIT A

### TABULATION OF PLAINTIFF'S CHECKS

| EXHIBIT | DATE | | AMOUNT |
|---------|------|---|--------|
| 2C | 12/3/77 | | 77.16 |
| 2D | 12/27/77 | | 153.19 |
| 2E | 12/29/77 | | 54.90 |
| 2F | 12/30/77 | | 37.92 |
| 2G | 1/3/78 | | 58.20 |
| 2A | 1/7/78 | (stipulated date) | 146.40 |
| 2H | 3/4/78 | | 62.22 |
| 2I | 3/8/78 | | 622.20 |
| 2B | 7/6/78 | (stipulated date) | 30.84 |
| 2J | 4/4/79 | | 78.80 |

(Not cashed by Bradlees)

## EXHIBIT B

### SUMMARY OF RAIN CHECKS

| Exhibit # | Date | Store | Quantity | Record | Price | Name |
|-----------|------|-------|----------|--------|-------|------|
| 1C | 1/3/78 | Woburn | 20 | | 3.88 | Lowenstern |
| 1B | 1/3/78 | Woburn | 20 | | 3.88 | Lowenstern |
| 1D | 1/4/78 | Watertown | 115 | | 3.66 | Lowenstern |
| 1E | 1/4/78 | Watertown | 25 | | 3.66 | Lowenstern |
| 1F | 2/18/78 | Framingham | 11 | | 3.66 | Lowenstern |
| 1G | 2/18/78 | Framingham | 15 | | 3.66 | Lowenstern |
| 1H | 3/4/78 | 882 | 21 | | 3.66 | Lowenstern |
| 1I | 3/4/78 | Dedham | 64 | | 3.66 | Lowenstern |
| 1A | 1/6/78 | Framingham | 86 | | 3.88 | Lowenstern |
| 1J | 2/19/79 | Framingham | 85 | Peaches & Herb | 3.84 | Jodi Webber |
| 1K | 2/19/79 | Framingham | 100 | Blues Brothers | 3.84 | Jodi Webber |
| 1L | 2/19/79 | Framingham | 85 | Commodores | 3.84 | Jodi Webber |
| 1M | 3/20/79 | Framingham | 100 | Doobie Brothers | 3.94 | |
| 1N | 3/24/79 | Framingham | 50 | Pointer Sisters | 3.94 | Lowe |
| 1O | 3/24/79 | Framingham | 100 | Dire Straits | 3.94 | |
| 1P | 3/24/79 | Framingham | 50 | Doobie Brothers | 3.94 | Lowe |
| 1Q | 3/24/79 | Framingham | 50 | Eddie Money | 3.94 | Lowe |

Total 997

**EXHIBIT C**

## ANALYSIS OF RECORD PURCHASES
## AND SALES (FROM EX. 4)

| Month | Bradlees Purchases | Total Purchases | Sales |
|---|---|---|---|
| Dec. '77 | 323.17 | 323.17 | - |
| Jan. '78 | 204.60 | 3,159.90 | 1,750.19 |
| Feb. '78 | - | 2,933.88 | 2,044.16 |
| Mar. '78 | 684.42 | 2,320.89 | 2,201.87 |
| Apr. '78 | - | 452.19 | 1,649.90 |
| May '78 | - | 548.05 | 910.68 |
| June '78 | - | 2,213.06 | 1,153.19 |
| July '78 | 30.84 | 1,319.99 | 1,614.84 |
| Aug. '78 | - | 634.36 | 1,673.20 |
| Sept. '78 | - | 1,420.67 | 1,248.71 |
| Oct. '78 | - | 2,203.04 | 912.35 |
| Nov. '78 | - | 3,489.53 | 1,186.82 |
| Dec. '78 | - | 5,524.79 | 5,340.12 |
| | | | |
| TOTAL '78 | 919.86 | 26,220.35 | 21,686.03 |
| | | | |
| Jan. '79 | - | 2,915.84 | 2,666.67 |
| Feb. '79 | 432.36 | 3,133.12 | 348.00 |
| Mar. '79 | 13.52 | 3,132.79 | 1,806.05 |
| Apr. '79 | - | 3515.65 | 10,134.29 |
| May '79 | - | 2,149.91 | 3,267.29 |
| June '79 | - | 915.17 | 3,210.00 |
| July '79 | - | 307.93 | 452.00 |
| Aug. '79 | - | 556.24 | 301.00 |
| Sept.-Dec. '79 | - | 1,470.70 | 53.00 |
| TOTAL '79 | 445.88 | 18,097.35 | 22,238.30 |
| | | | |
| TOTAL '77-'79 | 1,688.91 | 44,640.87 | 43,924.33 |