Louis G. Neofotistos *vs.* Harvard Brewing Co.

Middlesex.    October 6, 1960. — February 2, 1961.

Present: Spalding, Williams, Whittemore, & Cutter, JJ.

*Contract,* Construction, "Output" contract, Performance and breach.

A farmer had no cause of action against a brewer of malt beverages for
   breach of a contract between them whereby the brewer agreed to sell
   and the farmer agreed to buy all the waste grain produced at the
   brewery for a specified period of years, where, during that period, the
   brewer "voluntarily" ceased operating and closed the brewery because
   its operation, "in the judgment of the . . . [brewer, was] no longer
   profitable and did not warrant further continuance."

Contract. Writ in the Superior Court dated July 8, 1957.

At the trial before *Coddaire, J.,* there was a verdict for
the plaintiff. Both parties alleged exceptions.

*Theodore Chase,* (*Robert W. Emmons* with him,) for the
defendant.

·*Woodbury F. Howard,* (*George C. Eliades* with him,) for
the plaintiff.

Williams, J.    The plaintiff is a farmer living in Dracut
and the defendant a Delaware corporation which until Octo-
ber 31, 1956, was engaged in manufacturing malt beverages
in Lowell.    This is an action to recover damages for the
alleged breach by the defendant of a written contract
executed by the parties on May 1, 1955, whereby the plain-
tiff agreed to purchase and the defendant to sell "all of the
spent or waste grain resulting from the operation of the
company's brewery in Lowell . . . for a period of five years
commencing May 1, 1955."    It was provided that the plain-
tiff would purchase and take delivery of the grain by remov-
ing it daily at his own expense from the storage tank of the
defendant; that the amount so purchased would be measured
by an agreed method of computation; and that the price
would be determined bimonthly by a certain formula, but in

no event to be less than fifteen cents per bushel f.o.b. storage tank Lowell. The plaintiff was required to furnish a surety company performance bond.

The parties by written stipulation agreed on the following facts: It was understood that the plaintiff ''would have to have or procure certain trucks, equipment, etc.'' in order to ''discharge his obligations under the contract.'' The contract was ''duly performed'' by both parties through October 31, 1956, during which period the plaintiff paid the defendant $43,222.47 for grain. ''On November 1, 1956, the defendant voluntarily, and without the consent of the plaintiff, ceased the manufacture and sale of malt beverages because said operations, in the judgment of the defendant, were no longer profitable and did not warrant further continuance.'' Thereafter no more spent grain was produced and the brewery has remained closed. ''According to the yearly statements prepared by the defendant, there was for the year ending September 30, 1955, an operational loss of $163,142.55 amounting to $.87 a barrel and a net loss for all activities of the defendant of $184,582.43 amounting to $.98 a barrel; corresponding figures for the year ending September 30, 1956, are, respectively, $183,900.60, $1.05 and $267,502.12, $1.53.'' ''Prior to November 1, 1956, the plaintiff did not have knowledge of the financial condition of the defendant.'' He has been ''ready, able and willing'' to continue to perform his obligations under the contract.

On December 13, 1956, the defendant sold all of its physical assets and good will for $725,000, the buyer assuming the defendant's liabilities estimated to be about $1,000,000. A subsequent purchaser of the good will has continued to manufacture and sell malt beverages under the name of ''Harvard'' at locations other than Lowell.

An auditor to whom the case was referred and whose findings were not to be final found, in accordance with the stipulation, that from May 1, 1955, through October, 1956, the amount of spent grain from the Lowell brewery averaged 16,008 bushels per month and thereafter through April 30, 1960, under normal conditions would have continued to

average the same amount per month.  By application of the formula in the contract the price for the grain from May 1, 1955, to October 31, 1956, was fifteen cents per bushel and under normal conditions would have continued at that price until April 30, 1960.  To obtain spent grain from other sources between November 1, 1956, and April 30, 1960, the plaintiff would have had to pay twenty-five cents per bushel plus ten cents per bushel for transporting it to the brewery at Lowell.

The auditor found for the defendant and on reservations by the plaintiff the case was then tried to a jury.  At the trial the evidence consisted of the stipulation by the parties, the auditor's report, and testimony by the plaintiff and one witness which added nothing of material import to the facts contained in the stipulation and the auditor's report.  The defendant offered no evidence.  The plaintiff moved that the judge direct a verdict for the plaintiff in the sum of $134,667.20 with interest from the date of the writ.  The motion was denied and the plaintiff excepted.  A second motion by him that a verdict be directed in his favor for such damages as should be found by the jury was allowed and the defendant excepted.  It also excepted to the denial of its motion for a directed verdict.  The case is here on a joint bill of exceptions after a verdict for the plaintiff in the amount of $21,000.

The agreement which is the basis of the plaintiff's action is generally termed an ''output'' contract and in legal effect is similar to an agreement to buy or sell what will be ''needed'' or ''required,'' which is termed a ''requirement'' contract.  See Williston, Contracts (3d ed.) § 104A; *Burgess Sulphite Fibre Co.* v. *Broomfield,* 180 Mass. 283, 286–287.  No question is raised of its validity.  Although the amount of grain to be bought and sold was not specified, the agreement related to all of the waste grain resulting from the operation of the defendant's Lowell brewery and implied mutual promises of the parties to deal only with each other.  *Burgess Sulphite Fibre Co.* v. *Broomfield, supra. Brodsky* v. *George H. Morrill Co.* 237 Mass. 86, 88.

*Royal Paper Box Co.* v. *E. R. Apt Shoe Co.* 290 Mass. 207. See Restatement: Contracts, § 32, illustration 12; Corbin on Contracts, §§ 156, 158; Williston, Sales (Rev. ed.) § 464a–d. Its performance did not depend upon the will of either party. See *Gill* v. *Richmond Co-op. Assn. Inc.* 309 Mass. 73, 80; *Brightwater Paper Co.* v. *Monadnock Paper Mills,* 68 F. Supp. 714 (D. Mass.), affd. 161 F. 2d 869.

The point at issue is whether the defendant violated any implied term of the contract by ceasing to manufacture malt beverages and incidentally the production of spent grain. The plaintiff, in support of his contention that the defendant was bound to continue manufacture during the term of the contract, relies upon the decisions of this court in *Proctor* v. *Union Coal Co.* 243 Mass. 428, *Eastern Mass. St. Ry.* v. *Union St. Ry.* 269 Mass. 329, and *McNally* v. *Schell,* 293 Mass. 356.

In the *Proctor* case the plaintiff owned a farm on the shore of a lake where he conducted a retail milk business. He sold a portion of the farm to the defendant under an agreement that he could take broken ice from the ice houses on the lake for his ''necessary purposes . . . during the term of his natural life.'' The defendant sold the land to another and thereafter the plaintiff was unable to obtain ice. In an action for breach of contract it was held that ''[t]he construction [of the contract] that the defendant could terminate the plaintiff's rights at any time by a sale of the premises, would leave the plaintiff wholly at the mercy [of the defendant] . . . [and that] [i]t is not to be presumed that the parties intended so unreasonable an agreement, in the absence of language expressing such intention. . . . [The] contract required the defendant to furnish the plaintiff with ice for the rest of his life unless contingencies over which the defendant had no control and for which it could not be said to be at fault prevented'' (pages 432-433).

In *Eastern Mass. St. Ry.* v. *Union St. Ry., supra,* there was a contract by the parties for the joint use of their tracks, freight cars, and terminals for a period of five years with the right of either party to terminate it on six months'

notice. The plaintiff voluntarily ceased its freight business without giving the required notice. In an action by the plaintiff for an accounting the defendant in its answer alleged in set-off the plaintiff's breach of contract. It was held that "[t]he provisions of the contract, when interpreted in the light of the circumstances and purpose to be accomplished, mean that the plaintiff was under an obligation to carry on a freight trolley business during its term and not voluntarily to stop the normal flow of that business. . . . The continuance of that business was essential to the carrying out of the terms of the contract and hence an agreement to that effect is implied" (page 332).

In *McNally* v. *Schell, supra,* there was an agreement that the plaintiffs would manage the defendant's building for a period of five years receiving as compensation five per cent of the rentals collected. After about eighteen months the defendant sold the building and the plaintiffs were no longer able to collect the rents. It was held that "[t]he agreement . . . should be construed to import an implied promise on the part of the defendant not to disable the plaintiffs from their performance of the services to be rendered by them for him and thereby prevent them from receiving the commissions which they were entitled to withhold from the rentals" (page 360).

In the *Proctor* and *McNally* cases, the defendant, and in the *Eastern Mass. St. Ry.* case, the plaintiff, expressly agreed to devote designated property to the purposes of the contract and it was held that in the particular circumstances a promise to hold the property for that use during the term of the contract was implied. So far as appears there was no justification in any of these cases for the failure by the promisor to comply with such an implied promise.

In the instant case there was no agreement by the defendant to use its brewery for the production of any specific volume of malt beverages or indeed for any production. It was necessarily contemplated by the parties that, whatever the production, it would be governed by business conditions.

The plaintiff would have no redress if in the light of those conditions the volume of malt beverages was reduced to a point where the incidental production of grain was much less than he could reasonably have anticipated. In *Royal Paper Box Co.* v. *E. R. Apt Shoe Co., supra,* p. 210, we said in connection with a "requirement" contract, "If business conditions . . . resulted in reducing the defendant's requirements . . . far below the approximate estimate, that is the misfortune of the plaintiff, and any loss to it is a consequence of the kind of agreement into which it entered." Since there was no express obligation for the defendant to produce, there was no implied obligation to continue production. The only implied promise that the plaintiff could reasonably assume from the contract was that the defendant would carry out its agreement in good faith and do nothing to interfere with normal production. *Eastern Mass. St. Ry.* v. *Union St. Ry.* 269 Mass. 329, 334.[1]

It was stipulated that the defendant "voluntarily . . . ceased the manufacture and sale of malt beverages because said operations, in the judgment of the defendant, were no longer profitable and did not warrant further continuance." In view of this stipulation there was no question for the jury of the defendant's good faith or arbitrary interference with normal production. Since the plaintiff was not entitled to damages the exception of the plaintiff to the denial of his motion for a verdict in the sum of $134,667.20 is overruled. The exceptions of the defendant to the allowance of the plaintiff's motion for such damages as should be found by a jury and to the denial of its motion for a directed verdict are sustained. Judgment shall be entered for the defendant. G. L. c. 231, § 122.

*So ordered.*

---

[1] See now G. L. c. 106, § 1–203, inserted by St. 1957, c. 765, § 1.