**HML CORPORATION, Appellant,**

v.

**GENERAL FOODS CORPORATION.**

**No. 15483.**

United States Court of Appeals
Third Circuit.

Argued Feb. 1, 1966.

Decided Sept. 1, 1966.

78

Harold E. Kohn, Philadelphia, Pa., William T. Coleman, Jr., Robert W. Maris, Stuart H. Savett, Philadelphia, Pa., Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., of counsel, for appellant.

Lewis H. Van Dusen, Jr., Philadelphia, Pa., Robert S. Ryan, R. Philip Steinberg, Philadelphia, Pa., Drinker Biddle & Reath, Philadelphia, Pa., John A. Riegel, Gordon R. Brown, White Plains, N. Y., of counsel, for appellee.

Before STALEY, SMITH and FREEDMAN, Circuit Judges.

FREEDMAN, Circuit Judge.

In this suit for breach of a contract, plaintiff, HML Corporation (formerly Cream Wipt Foods, Inc.), appeals from a judgment of dismissal entered at the conclusion of its case by the district judge sitting without a jury.

The following facts are uncontested. Beginning in 1934 plaintiff had been manufacturing and distributing a salad dressing under the trademarked name "Cream Wipt". In 1956 defendant began to distribute a dessert topping mix under the name "Dream Whip", and applied for trademark protection. Plaintiff successfully opposed the application on the ground that "Dream Whip" should be barred because of its "Cream Wipt" registration. Cream Wipt Foods, Inc. v. General Foods Corp., 278 F.2d 521 (C.C.P.A.1960). This decision, announced on May 24, 1960, seriously imperiled defendant's four year investment in the name "Dream Whip".

On September 14, 1960 the parties executed two contracts, which they arrived at after negotiations in which they were represented by counsel. In the so-called "Main Agreement" defendant agreed to purchase from plaintiff and its president and principal shareholder, Harry M. Levin, the "Cream Wipt" trademark, the process, and a patent, for a total price

of $250,000 in cash.[1] The agreement contained the usual covenants and representations, and in addition provided that defendant's obligation to close, which was set for October 31, 1960, was contingent on the simultaneous execution of a "Supply Agreement", which both parties would execute in good faith. The "Main Agreement" also provided that plaintiff would change its name from "Cream Wipt Foods, Inc.", and that neither plaintiff nor Mr. Levin would compete with General Foods for ten years in the manufacture of salad dressing.

In the "Supply Agreement" plaintiff agreed to sell and defendant agreed to buy for thirty-two months in monthly orders at least 85% of its "requirements" of salad dressing in a designated geographic area. The price was carefully spelled out in a formula which provided reimbursement to plaintiff of its cost of ingredients and processing and a fixed profit, plus one-half of defendant's profits in excess of 28%. Defendant reserved the right to buy from others what plaintiff could not produce, or to terminate the contract if plaintiff consistently failed to meet quality controls or to supply 85% of defendant's requirements. No minimum quantity was fixed, but a maximum requirement was set at 5,000 gallons per day. The agreement gave to the defendant extensive rights to supervise, inspect and reject and to instruct plaintiff in the manufacture of the salad dressing, but at defendant's expense except in so far as plaintiff failed to meet quality standards. Plaintiff had the right to terminate the contract if its profits should fall below 5% of its costs.

After the closing, defendant, acting under a provision in the agreements, directed plaintiff to terminate its brokerage and advertising and promotion contracts and reimbursed it for the costs of cancellation. Both parties gave notice to the trade that defendant had assumed the sales and distribution of the salad dressing. Defendant undertook certain market tests,[2] while continuing to distribute the salad dressing through brokers designated by it. During this period, defendant's requirements amounted to about 5,000 gallons monthly. Although plaintiff had anticipated such a period of cautious study and evaluation by defendant, it continued to take an active interest in the progress of the product and frequently volunteered to defendant suggestions and requests, of which a few minor ones were acted upon.

On February 17, 1961, after four months had run under the agreement, defendant notified plaintiff that it had determined that it could not profitably market the salad dressing and therefore would not require any further production. Plaintiff's efforts to persuade defendant to alter this decision were unavailing, although defendant agreed to permit plaintiff to manufacture and distribute the product to one customer on its own account under a different name without royalty or other liability. Two years later, on January 1, 1963, plaintiff's plant was destroyed by fire and defendant terminated the contract on the ground that plaintiff could no longer produce any requirements it might have. Plaintiff responded that it was still prepared to fill defendant's orders, notwithstanding the destruction of its plant and equipment.

In addition to these facts, plaintiff introduced testimony of Mr. Levin and his wife that plaintiff had demanded $750,000 to settle the trademark dispute, and had agreed to the offer of $250,000 because it expected to realize the difference through the "Supply Contract", as a result of oral assurances given by defendant's representatives during the negotiations that defendant would exert its best efforts to promote the salad dressing and that a great success was likely

---

1. The agreement involved also a trademark known as "SalaDream" covering salad dressing products. Of the total cash price $100,000 was to be paid to plaintiff and $150,000 to Mr. Levin.

2. Plaintiff's contention that there was no proof of this because defendant never put in a case is unfounded. Plaintiff produced oral and written evidence of defendant's market and promotion activities.

"if it clicked". Mrs. Levin also testified to subsequent oral statements by defendant's representatives which bore on the good faith of its decision to cease distribution.

As the case was tried in the court below, the issue was whether defendant had a duty to promote the salad dressing and if so, whether it had acted in good faith in deciding to cease distribution. Plaintiff specifically acknowledged that it made no claim that defendant had misrepresented its intentions during the negotiations leading to the contracts. At the close of plaintiff's case the court dismissed the action. It held that the parole evidence of Mr. and Mrs. Levin was legally inadmissible to prove an undertaking by defendant to promote the sale of salad dressing and found that plaintiff had not proven the factual existence of a duty to promote and that none was to be implied in law in the circumstances. The court also found that plaintiff had not established by any evidence of probative value that defendant's decision to cease distribution had been made in bad faith.[3]

Plaintiff now contends that either as a matter of construction of the intention of the parties, or by implication of law, defendant assumed a duty to promote the product or at least to maintain requirements by continuing to distribute it. It argues that a good faith determination to cease promotion or distribution, if exculpatory at all, would constitute a justification or excuse for a breach, and that defendant therefore was required to prove it.

We apply the law of New York, which the parties by their contract agreed should govern. Although New York has adopted the Uniform Commercial Code, it applies only to transactions entered into after September 27, 1964, when it went into effect and therefore is inapplicable here. Uniform Commercial Code (New York) § 10–105, 62½ McKinney's Consolidated Laws of New York Annot. (1964) § 10–105, p. 654.

■ Where an owner of a product gives an exclusive agency, solely in return for royalties, but no promise is expressed on the part of the agent to use his best efforts to promote it, the courts have implied such a promise. In the leading case of Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 91, 118 N.E. 214 (1917) Judge Cardozo said: "The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. * * * The defendant gave an *exclusive* privilege. She was to have no right for at least a year to place her own indorsements or market her own designs except through the agency of the plaintiff. The acceptance of the exclusive agency was an assumption of its duties. * * * We are not to suppose that one party was to be placed at the mercy of the other. * * * Many other terms of the agreement point the same way. * * * [T]he terms of the defendant's compensation are even more significant. Her sole compensation for the grant of an exclusive agency is to be one-half of all the profits resulting from the plaintiff's efforts. Unless he gave his efforts, she could never get anything."

■ That rule is inapplicable here. While plaintiff originally was the owner of the product, this was not the simple grant of an exclusive distributorship in return for a share of the profits. Defendant bought from the plaintiff its interest and good will in the product, as well as the name, in return for a substantial cash payment. The court below found that the primary purpose of the "Supply Agreement" was for the benefit of the defendant so that it would have a ready source of supply of the product in accordance with its requirements. We cannot say from an examination of the agreements and the record that this con-

3. On this question the court evidently considered the parole evidence. On plaintiff's motion for new trial, the court expanded on its discussion of the parole evidence, specifically refusing to credit that of Mr. Levin.

clusion is erroneous. Nor need we definitively determine the precise limits of the defendant's obligation in the peculiar circumstances of this case. Cases such as percentage leases and the distinctions which have been drawn regarding an implied obligation of the lessee to use and occupy the premises where a substantial minimum rental is provided and those where there is no minimum rental may be looked to for some analogy.[4] In these and similar circumstances the seller or lessor is not at the mercy of the buyer or lessee and the terms of the contract which provide a substantial minimum payment therefore negative an implication of a duty to promote, drawn from equitable considerations. The choice lies between implying a promise to correct an apparent injustice in the contract, as against holding the parties to the bargain which they have made. The latter alternative has especial force where the bargain is the result of elaborate negotiations in which the parties are aided by counsel, and in such circumstances it is easier to assume that a failure to make provision in the agreement resulted not from ignorance of the problem, but from an agreement not to require it. In this case the plaintiff argues that in a requirements contract the buyer impliedly promises to maintain his requirements. Here, as in percentage lease cases, the decisions are not all uniform in the strength assigned to the effort to equalize the agreement on the one hand and the reliance on the parties' bargain on the other. The better view, however, is that generally the buyer in a requirements contract is required merely to exercise good faith in determining his requirements and the seller assumes the risk of all good faith variations in the buyer's requirements even to the extent of a determination to liquidate or discontinue the business. The rule is based on a reliance on the self-interest of the buyer, who ordinarily will seek to have the largest possible requirements. Protection against abuse is afforded by penetrating through any device by which the requirement is siphoned off in some other form to the detriment of the seller. The requirement of good faith is the means by which this is enforced and self-interest in its undistorted form is maintained as the standard. New York accepts this view.[5]

Professor Corbin gives us an excellent analysis of the problem: "As to these matters there is certainly a gap in the express words of agreement. Shall it be filled by process of implication, thereby increasing the burden of performance by the buyer, the extent of his contractual duty. * * * If it were necessary in order that the contract should not be unreasonable or unfair to one of the parties (the seller) according to prevailing standards and usage, the implication should be made; but it is not necessary for that purpose. If such agreements, in spite of the unfilled gap, were commonly so understood and performed by business men, the additional unstated duty and

---

4. See Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 200 N.E.2d 248 (1964); Dickey v. Philadelphia Minit-Man Corp., 377 Pa. 549, 105 A.2d 580 (1954); 1 American Law of Property (1952), §§ 3.41, 3.66. See also Note, 44 Cornell L.Q. 251 (1959).

5. E. g., Edison Electric Illuminating Co. of Brooklyn v. Thacher, 229 N.Y. 172, 178, 128 N.E. 124 (1920); New York Central Iron Works Co. v. United States Radiator Co., 174 N.Y. 331, 66 N.E. 967 (1903); Duboff v. Matam Corp., 272 App. Div. 502, 71 N.Y.S.2d 134 (1947). See also, William C. Atwater & Co. v. Terminal Coal Corp., 32 F.Supp. 178, 184–185 (D.Mass., 1940), aff'd, 115 F.2d 887 (1 Cir. 1940), applying New York law; In re United Cigar Stores, 72 F.2d 673, 675 (2 Cir. 1932), cert. denied, Consolidated Dairy Products Co. v. Irving Trust Co., 293 U.S. 617, 55 S.Ct. 210, 79 L.Ed. 706 (1934); Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 171 N.E.2d 865 (1961); 2 Williston, Sales (rev. ed. 1948), §§ 464(a), 464(b); Restatement, Second, Contracts, (Tentative Draft No. 2), § 79, Illustration 8.

Although the Uniform Commercial Code, § 2–306(1), is not applicable to this case, the text and the official comment show that it does not intend to establish any new doctrine. See Note, Requirements Contracts: Problems of Drafting and Construction, 78 Harv.L.Rev. 1213, 1220 (1965).

burden should be put upon the buyer by implication; but no such understanding or performance can as yet be shown.

"Here, then, is a gap that should not be filled by the court. The implication suggested might not be unreasonable— at least the added promise is one that men sometimes make in words; but refusal to make the implication does not make the contract unenforceable, unreasonable or one-sided. The seller may be quite willing to trust to the self-interest of the buyer, to his desire to continue a profitable business, and to his promise to buy exclusively of the seller, without any further promise on the buyer's part. The risk of there being no needs or requirements the seller may be quite willing to carry; and he can adjust his prices in proportion to the risk.

"Only the least thought is necessary to realize that a 'gap' in an agreement should not be filled merely because a gap exists. * * * The subject matter and content of any contract is limited, all the rest of the world being excluded. * * * A promise that is not there in language, or an unexpressed condition of an express promise, should be put in by process of implication only when the conduct of the parties reasonably interpreted already has expressed it. It should be put in by construction of law, in the absence of justified implication, only when justice imperiously demands it under the circumstances that have arisen." (3 Corbin, Contracts (1960) § 569, pp. 339–341).

The parties were well aware that the contract arose out of the defendant's desire to use the trademarked name. And in the circumstances if defendant after acquiring it and having the plaintiff's obligation to supply the product needed was to be bound by any specific obligations of performance the usual desirability of providing for it in the agreement was here even more pronounced. The absence of such a provision in the agreement therefore has greater significance in this case than in the ordinary requirements contract.

■ The normal interpretation of the agreement cannot be altered by the plaintiff's effort to show a parol representation that defendant would exert additional effort to promote the product. The parties reduced their bargain to writing and plaintiff formally disavowed at the trial any claim of fraud. Indeed, each contract contained the explicit statement that it incorporated the entire agreement of the parties, and the "Supply Agreement" provided in addition that "as an inducement to us [defendant] to enter into this agreement you [plaintiff] represent that no representations or statements have been made to you by us or our officers, agents, employees, or representatives, which would in any way tend to add to, modify, or change any one or more of the provisions of this agreement". The agreement, therefore, "was complete in itself". Edison Electric Illuminating Co. v. Thacher, supra, at 229 N.Y. 178, 128 N.E. 124.

■ Moreover, the result reached by the court below would not be altered even if the parol evidence were to be considered. Indeed, the claim that plaintiff was greatly concerned over a guarantee that defendant would expend effort and energy on the product shows that it was sufficiently in mind to have been embodied in the agreement if both parties intended it to be binding. Certainly the silence of the agreement on this subject, although it specified a maximum quantity, justifies the conclusion that no such obligation existed. In any event, the trial judge refused to credit Mr. Levin's testimony on which this claim is largely based; and this, of course, was an issue which was peculiarly for his judgment.[6]

■ There remains then the question whether defendant acted in good faith in deciding that it had no need for the product. There is not much dis-

---

6. The trial judge in dismissing the motion for new trial stated that he gave no credit to the testimony of Mr. Levin. In view of this, we cannot say that he credited the corroborating testimony of Mrs. Levin.

pute on whether this was shown. On the contrary, it is argued by plaintiff that the burden was upon the defendant to establish the good faith of its decision. Since the contract made no provision for a minimum requirement by defendant, its notice to plaintiff that it had no requirement did not of itself constitute a breach of the agreement. It follows that since plaintiff claimed a breach it was its duty to prove it, and the burden, therefore, rested upon it to show that defendant had acted in bad faith. See New York Central Iron Works Co. v. United States Radiator Co., supra, 174 N.Y. at 335–336, 66 N.E. 967. The court below found that this burden was not met and we cannot say that its finding was so clearly erroneous that it must be set aside.

The judgment of the court below therefore will be affirmed.