**ALLIED COMMUNICATIONS CORPORATION, Plaintiff, Appellant,**

v.

**CONTINENTAL CELLULAR CORPORATION, Defendant, Appellee.**

**No. 86–1885.**

United States Court of Appeals, First Circuit.

Argued Feb. 5, 1987.

Decided June 23, 1987.

James Pollock with whom Robert V. Lizza, Miriam R. Goldstein, Sherburne, Powers & Needham, J. Albert Johnson, and Johnson, Mee & May, Boston, Mass., were on brief, for plaintiff, appellant.

Ira K. Gross with whom Margaret H. Raymond, and Sullivan & Worcester, Boston, Mass., were on brief, for defendant, appellee.

Before BREYER, ALDRICH and SELYA, Circuit Judges.

BREYER, Circuit Judge.

The appeal in this diversity case raises an issue of Massachusetts contract law: Does a written contract between Allied

Communications Corporation (Allied), the appellant, and Continental Cellular Corporation (Continental), the appellee, contain an implied promise by Continental to remain in business in the Boston area? The district court read the contract, and after considering affidavits, depositions and answers to interrogatories, concluded that the contract contained no such promise. Having rejected Allied's arguments for implying the promise, and finding no genuine issue as to any material fact, the court granted summary judgment in Continental's favor. *See* Fed.R.Civ.P. 56. In our view, the district court's judgment was legally correct.

Allied and Continental entered their written contract in September 1984. At that time Continental was in the process of entering the Boston market in cellular telecommunications services. Continental intended to buy communications "airtime" from two firms that operate a network of low-power radio receivers and transmitters, placed in geographically adjoining areas, called "cells," in or near Boston. Continental would resell that "airtime" in the form of an automobile telephone service to drivers who wanted to use phones in their cars. Allied, a firm that services automobile telephone equipment, would install, maintain and repair the equipment that Continental's customers would use.

The contract imposes three basic kinds of obligations on Allied, and three on Continental. Allied promises: 1) to promote Continental's service—to use its "best efforts" to solicit customers for Continental and to place them on Continental's Boston Cellular Network, 2) to install Continental telephones in the automobiles of Continental subscribers, and 3) to maintain and to repair the car telephones of Continental subscribers who have maintenance agreements. In return, Continental essentially promises: 1) to pay Allied a percentage of the Revenue Margin it receives from the customers Allied finds; 2) to pay for Allied's installations of the Continental phones, at a 20% discount from Allied's normal rates; and 3) to pay for the repair and maintenance service that Allied provides Continental customers. The contract was to be in force for seven years, renewing automatically thereafter from year to year (unless there was an uncured breach).

Apparently, soon after Continental and Allied signed their contract, Continental prepared new market projections that showed that Continental would find Boston a far more costly market to develop than it had previously imagined. In December 1984, Continental told Allied it would close its operations in Boston. Allied then brought this suit, and it now appeals the district court's award of summary judgment for Continental.

■ Since the contract contains no express promise by Continental to remain in business, the question is whether or not to imply such a promise. Massachusetts courts, like many other courts, leave determination of any relevant background facts in such cases to juries, but they treat the question of whether to imply a promise from given language and background as one for the judge. *See* E. Farnsworth, *Contracts* § 7.16, at 520 (1982). They look to the type of contract in question, precedent and general contract principles to help determine whether the law permits the implication of a promise in the circumstances. *See, e.g., Neofotistos v. Harvard Brewing Co.,* 341 Mass. 684, 171 N.E.2d 865 (1961) (examining precedent and the nature of an output contract in deciding not to imply a promise to stay in business). *But cf. 407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.,* 23 N.Y.2d 275, 244 N.E.2d 37, 296 N.Y.S.2d 338 (1968) (holding that the jury should decide whether the contract imported a promise to stay in business). This allocation of role between judges and juries may reflect the fear that leaving juries totally free to imply whatever promises might in a layman's sense seem "reasonable" would unduly undermine contracting parties' need for certainty. *Cf.* E. Farnsworth, *supra,* § 7.16, at 525 (noting that in recurring situations courts will try to imply terms that promote certainty). The allocation permits a judge to decide the issue on a motion for summary judgment, as long as the underlying facts are not in dispute.

In this summary judgment case, we view the facts in Allied's favor insofar as the evidence reasonably permits. Given these extrinsic facts, the contract's language and Massachusetts precedent, we conclude that the district court properly granted summary judgment for Continental. We believe a promise by Continental to remain in business cannot be implied for the following reasons.

First, the express language of the contract contains no such promise. That language contains several unconditional express promises by *Allied* that Allied could fulfill only by staying in business, but it contains no comparable express promise by *Continental.* For example, the contract provides:

Allied shall market and promote the Continental Boston Cellular Network....

\* \* \* \* \* \*

Allied shall establish and maintain ... a service network....

\* \* \* \* \* \*

Allied ... shall provide installation, repair and maintenance services to all purchasers of Continental Cellular Telephones....

Agreement, ¶¶ 1.1, 3.1, 3.2. Continental's express promises, however, are all *conditional:* they impose no obligations on Continental unless it first decides to continue operations. For example, the contractual language most favorable to Allied's position says:

Continental will use its best efforts to ensure that cellular telephone numbers are available for assignment to prospective Allied Cellular Customers. [But "Allied Cellular Customers" are persons who "have been placed on" and "*continue to remain as* subscribers on the Continental Boston Cellular Network." (Emphasis added.)]

\* \* \* \* \* \*

Continental shall ... maintain an inventory of Continental Cellular Telephones ... at Allied's principal place of business ... equal to Allied's average biweekly sales of Continental Cellular Telephones during the preceding three months.

\* \* \* \* \* \*

Continental shall direct all Continental Customers ... who are subscribers on the Continental Boston Cellular Network, exclusively to the Allied Service Network for ... installation....

\* \* \* \* \* \*

Continental will use its best efforts to insure that all Continental Customers ... have their cellular telephone equipment installed and serviced by Allied....

Agreement, ¶¶ 1.1, 1.2, 2.1, 3.3. This language contains no express promise by Continental to remain in business, to have customers, to make certain it is possible to "remain as [Continental] subscribers," or to see that Allied's "average biweekly [telephone] sales" are greater than zero. The detail of the contract, reflecting the commercial nature of the transaction and the sophistication of the parties, suggests that the difference in the phrasing of the parties' respective promises is significant. It tends to show that the parties wrote unconditional language when they wanted to make unconditional promises. It indicates that the omission of an express promise by Continental reflected neither oversight nor an integral but unspoken contractual assumption that Continental would remain in business. *See* E. Farnsworth, *supra,* § 7.16, at 521. It suggests that the reason that the contract contains no express promise to stay in business is that Continental did not want to make any such promise. *Cf. New England Structures, Inc. v. Loranger,* 354 Mass. 62, 69, 234 N.E.2d 888, 893 (1968) (declining to imply a term when "[i]t would have been natural for the parties to have provided expressly [for that term] if that had been the purpose").

Second, extrinsic facts also suggest that we should not imply the promise. 1) Cellular communications was an industry new to the Boston market. This fact makes understandable Continental's reluctance to commit itself to stay in the industry. It makes less credible the assertion that the contract rests upon a shared assumption that Continental was obliged to stay. 2)

Allied concedes that it might have made a less risky arrangement with NYNEX, a firm almost certain to remain in the Boston area. Instead, Allied accepted Continental's "more lucrative" offer. The possibility that Continental would cease operations therefore appears to have been a risk consciously assumed by Allied in exchange for a potentially much higher return on its investment. Allied "doubtless hoped for and may have expected the best, but it also knew the worst and ... took the risk." *Baetjer v. New England Alcohol Co.*, 319 Mass. 592, 601, 66 N.E.2d 798, 803 (1946). We hesitate to disturb this apparent allocation of risk among the parties. *Cf. S.M. Wilson & Co. v. Smith Int'l, Inc.*, 587 F.2d 1363, 1375 (9th Cir.1978) ("Risk shifting is socially expensive and should not be undertaken in the absence of a good reason."). 3) During negotiations, Allied specifically asked Continental to include a clause imposing liability for liquidated damages should it leave the Boston market, but Continental refused to do so. The parties disagree about why Continental rejected the clause, but the fact that Allied asked for it shows that the parties contemplated the possibility that Continental might cease operations. The omission of a promise by Continental therefore appears not to be an accident. *See So Good Potato Chip Co. v. Frito-Lay, Inc.*, 462 F.2d 239, 241 (8th Cir. 1972) ("A covenant cannot be implied if the parties ... have left the agreement intentionally silent on the point."); *cf. Glidden Co. v. Hellenic Lines, Ltd.*, 275 F.2d 253, 257 (2d Cir.1960) (declining to imply a term that a party had previously refused to include in a written agreement). 4) Although Allied invested over $40,000 in expanding its garage, and it hired new employees in anticipation of increased business from Continental, Allied admits that it can use or has used most of this investment to service other companies in the car phone business. Enforcement of a literal interpretation is therefore not so obviously unfair as to make it necessary to assume that the contract embodied the promise in question.

Third, no one can claim here that to read the contract sensibly one must imply a promise. A literal interpretation of the contract without an implied promise *also* makes perfectly good business sense. Under a literal interpretation, Allied in effect promises to promote Continental's business insofar as Continental offers telecommunications services, if any, and to provide Continental whatever installation and repair service its customers may need, if any. In return, Continental promises to pay a percentage of the Revenue Margin earned from the customers Allied sends, and to use Allied exclusively for installation and repair service. This type of arrangement is often found when a party cannot readily predict its needs. In a "requirements contract," for example, a supplying party "assumes the risk of all good faith variations in the [customer's] requirements even to the extent of a determination to liquidate or discontinue the business." *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 81 (3d Cir.1966). Thus, promises of the sort literally exchanged here are not unusual.

Fourth, Massachusetts case law supports a literal reading of the contract. In *Neofotistos v. Harvard Brewing Co.*, the Massachusetts case most closely analogous to this one, a brewer agreed to sell a nearby farmer "all of the spent or waste grain resulting from the operation of the company's brewery ... for a period of five years." *Id.* 341 Mass. at 684, 171 N.E.2d at 866. The brewer then closed the business, and the farmer sued. The Supreme Judicial Court reversed the trial court's directed verdict for the plaintiff and ordered judgment for the defendant. The Supreme Judicial Court noted that "there was no agreement by the defendant to use the brewery for the production of any specific volume of malt beverages or indeed for any production," *id.* at 688, 171 N.E.2d at 868, and it held that there was therefore no basis for implying an obligation to continue production. We recognize that *Neofotistos* involved a promise to sell the defendant's "output"—a promise the "legal effect" of which the court likened to a "requirements contract"—whereas here Continental promises to send not its output, but its customers to Allied. But we do not

see why that fact should make a legal difference. Moreover, in *Neofotistos,* the plaintiff had to invest money in equipment in order to carry out its part of the bargain, the plaintiff did not know that the brewer was in shaky financial condition, and the contract was for a fixed term of five years. These facts, if anything, provide stronger grounds for implying a promise in *Neofotistos* than here, where Allied could have renewed the contract indefinitely and where Allied was aware that the venture was risky.

Allied points to three other Massachusetts cases that it considers precedent in its favor. In *Eastern Mass. St. Ry. Co. v. Union St. Ry. Co.,* 269 Mass. 329, 168 N.E. 781 (1929), two companies agreed jointly to use certain tracks, cars and freight terminals. The contract permitted termination on six months' notice. The court implied a promise to continue using the facilities pending expiration of the six months. *Id.* at 332, 168 N.E. at 782. In *McNally v. Schell,* 293 Mass. 356, 199 N.E. 748 (1936), the defendant promised to make the plaintiff the manager of his building for five years and to pay him a percentage of the rents collected. The court implied a promise not to sell the building before expiration of the full term. *Id.* at 360, 199 N.E. at 749. In *Proctor v. Union Coal Co.,* 243 Mass. 428, 137 N.E. 659 (1923), the defendant bought plaintiff's land, promising to provide him lifetime access to ice houses located on the land. The court implied a promise not to resell the land without some guarantee of continued access. *Id.* at 432, 137 N.E. at 660. The *Neofotistos* court distinguished these cases, pointing out that in the case before it there was no express agreement to devote designated property to the purposes of the contract and that the parties necessarily contemplated "that, whatever the production, it would be governed by business conditions." 341 Mass. at 688, 171 N.E.2d at 868. The same is true of the case before us.

Allied points to a New York case that more strongly supports its position: *407 East 61st Garage, Inc. v. Savoy Fifth Ave. Corp.* In that case, a garage "had undertaken to furnish garage services for a peri-od of five years to guests of the Savoy Hilton and to pay Savoy 10% of its gross transient storage charges to the hotel guests." 23 N.Y.2d at 277, 244 N.E.2d at 38, 296 N.Y.S.2d at 340. Savoy agreed "to use all reasonable efforts to enable [the garage] to have, throughout the term of [the] agreement, the exclusive right and privilege of storing the motor vehicles of [the hotel's] guests, tenants and patrons." *Id.* at 278, 244 N.E.2d at 39, 296 N.Y.S.2d at 340. Two years later, due to financial losses, Savoy sold the hotel and went out of business. Although the agreement contained no express promise by Savoy to stay in business, and despite Savoy's allegation that the garage knew of its unstable economic condition, the court upset a summary judgment for the Savoy. It remanded the case for a trial to resolve some factual matters bearing on the existence of "an implied promise by Savoy to fulfill its obligations for an entire five-year period." *Id.* at 281, 244 N.E.2d at 41, 296 N.Y.S.2d at 343.

The similarity between *Savoy* and the present case is strong, but there are important differences. The term of the contract between Allied and Continental is not five years, but can stretch on indefinitely. The industry in *Savoy* was not a new one, but well established. *Savoy* lacks any indication that the contract was detailed, the parties sophisticated, or that the venture made business sense if the contract was construed without the implied promise. Unlike the case in *Savoy,* the contractual language and background circumstances here do not reveal unresolved factual questions. In any event, it is the Massachusetts case, *Neofotistos,* not the New York case, that must govern our decision here.

We believe that the question before us is a close one. But we also believe that when the transaction is commercial, the parties sophisticated, and the contract itself detailed, it is wiser for courts to rely on express language than to imply a promise on their own. In so doing, they promote certainty and thereby permit the parties greater freedom to write the commercial rules they desire. As Judge Learned Hand

pointed out, "in commercial transactions it does not in the end promote justice to seek strained interpretations in aid of those who do not protect themselves." *James Baird Co. v. Gimbel Bros., Inc.,* 64 F.2d 344, 346 (2d Cir.1933).

 Allied raises two final points. First, it says that even if Continental did not have an obligation to stay in business, it at least had an obligation to avoid "bad faith" in deciding to close operations. *See Uproar Co. v. National Broadcasting Co.,* 81 F.2d 373, 377 (1st Cir.), *cert. denied,* 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393 (1936); *Kerrigan v. Boston,* 361 Mass. 24, 33, 278 N.E.2d 387, 393 (1972) ("Every contract implies good faith and fair dealing between the parties to it."). In support of its claim that Continental acted in bad faith, however, Allied points only to evidence suggesting that Continental left Boston, not because it feared losing money, but because it lost confidence in its Boston manager and thought it could do better elsewhere. Assuming this allegation is true, the evidence is nonetheless inadequate to show breach of the obligation to act in good faith. *See Lambert Corp. v. Evans,* 575 F.2d 132, 138 (7th Cir.1978) (noting that a court cannot find bad faith if the defendant acted on a sincere business judgment and not on the desire to avoid contractual obligations). Second, Allied says that Continental violated Massachusetts consumer protection law. *See* Mass.Gen.L. ch. 93A. Allied urges this claim on appeal, however, on the grounds that the termination was unfair and that Continental misrepresented its commitment to remain in the Boston market. We agree with the district court that, having found that Continental had no obligation to remain in business, its termination of operations cannot amount to an unfair act under the statute. The second ground—that Continental misrepresented its commitment—was raised neither in its complaint nor in its Memorandum in Opposition to Continental's Motion for Summary Judgment. We therefore consider the claim waived. *See Dobb v. Baker,* 505 F.2d 1041, 1044 (1st Cir.1974).

The judgment of the district court is *Affirmed.*