NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-420

MOUNT AUBURN HOSPITAL

vs.

COMMERCE INSURANCE COMPANY.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Commerce Insurance Company (Commerce), appeals from (1) two decisions of the Appellate Division of the District Court that ordered summary judgment on liability for the plaintiff, Mount Auburn Hospital (MAH); and (2) two resulting money judgments that, on remand, the District Court entered in MAH's favor against Commerce. MAH brought the claims at issue under G. L. c. 90, § 34M, to recover personal injury protection (PIP) payments for the full amount MAH billed for medical services it rendered to two of Commerce's insureds. MAH had previously entered into an agreement with a third party under which MAH agreed to accept only ninety-five percent of its billed charges as full payment for its provision of certain

covered services.  The Appellate Division concluded, however, that MAH's agreement and related contracts do not relieve Commerce of its obligation to pay one hundred percent of MAH's charges for the services rendered to Commerce's insureds.  We conclude otherwise:  MAH's agreement bound it to accept ninety-five percent payment from Commerce.  We therefore reverse.[1]

Background.  Although the relevant contracts are complex, the parties' dispute is quite narrow.  We set forth only the minimum background necessary to frame the issue before us.

1.  Facts and procedure.  In 2017, MAH provided medical services to two persons entitled to PIP benefits under automobile insurance policies issued to them by Commerce.  Significantly for present purposes, neither person was then an employee, either of Commerce or apparently of any other employer.  Commerce paid MAH ninety-five percent of the amounts that MAH billed for the services MAH provided to each insured.

MAH then brought small claims actions against Commerce to recover the remaining amounts billed.  The cases were removed to the District Court's regular civil docket, and MAH filed amended

---

[1] We acknowledge the amicus brief filed by CCC Intelligent Solutions Inc., which acquired Auto Injury Solutions, Inc.; as described infra, Auto Injury Solutions is a party to one of the contracts at issue.

2

complaints.[2]  A judge ordered summary judgment for Commerce in both cases.  MAH appealed to the Appellate Division, which issued a consolidated opinion concluding that MAH was entitled to summary judgment on liability on its claims under G. L. c. 90, § 34M.[3]  The cases were returned to the trial court to determine damages.  Money judgments then entered for MAH in both cases, and Commerce appealed.[4]  Contemporaneous with this decision, we have ordered the appeals consolidated.

2.  <u>The relevant agreements</u>.  In 2007, MAH entered a preferred provider agreement with Prime Health Services, Inc. (Prime).  In the agreement, which the parties refer to as a PPO agreement, Prime refers to itself as a PPO, and we adopt both

---

[2] The amended complaints asserted claims under G. L. c. 90, § 34M; G. L. c. 175, § 113C; G. L. c. 93A; and G. L. c. 176D.

[3] The Appellate Division affirmed the summary judgments for Commerce on the G. L. c. 93A claims, did not address MAH's claim under G. L. c. 175, § 113C, and declined to reach MAH's claim under G. L. c. 176D.  None of those claims are at issue in the present appeal.

[4] Although it might be questioned whether these appeals should have come directly here rather than first to the Appellate Division, the same occurred in <u>Cummings Props., LLC</u> v. <u>National Communications Corp</u>., 449 Mass. 490, 493-494 (2007), where the Supreme Judicial Court, without comment, reached the merits of the appeal.  We reach the merits here, too, seeing nothing to be gained by requiring another trip to the Appellate Division, which has already expressed its view on the sole issue before us.

3

terms herein.[5]  As succinctly described by the Appellate Division, the PPO agreement requires MAH "among other things, to accept as full payment 95% of its bills for covered services rendered by Prime's network of insurance company payors of which, by means of other agreements, Commerce [is] one."

One of those "other agreements" is Prime's 2015 network access agreement (NAA) with Auto Injury Solutions, Inc. (AIS), by which Prime gave AIS access to Prime's PPO network of providers at the rate Prime had negotiated.  The second "other agreement[]" is AIS's 2012 PPO master services agreement (MSA-PPO) with Commerce, under which AIS allowed Commerce to share in AIS's PPO network access.  Those agreements, whether separately or together, appear to constitute a "payor program" as defined in the PPO agreement, and the parties here agree that Commerce has such a program.[6]

---

[5] The parties do not address, and we express no view on, whether Prime is a PPO, MAH is a preferred provider, or any of the contracts at issue creates a preferred provider organization or PPO arrangement, as those terms are defined in State law. See, e.g., G. L. c. 176I, §§ 1-13.

[6] MAH's brief refers to payments to it for covered services "for which Commerce is liable under its (Commerce's) 'Payor Program,'" and, as reflected in the Appellate Division's decision, MAH previously cited the NAA between Prime and AIS as such a program.  Commerce's brief also asserts that the MSA-PPO agreement between it and AIS is a payor program.

4

MAH's PPO agreement with Prime binds MAH, when furnishing "covered services" to "covered persons," to accept compensation at the rate of ninety-five percent of its submitted billed charges.[7]  Prime's NAA with AIS and AIS's MSA-PPO with Commerce also use those terms.  The scope of MAH's rights and duties vis-à-vis Commerce thus turns in part on the meaning of the terms "covered services" and "covered person."

The term "covered services" itself is not in dispute.  The PPO agreement defines "covered services" to mean "those group health, workers' compensation, or first party auto medical liability, or additional network services offered by PPO, which covered persons are entitled to receive through participating providers as defined under the payor program" or under applicable laws, rules, or regulations.  This is not inconsistent with the NAA and the MSA-PPO, both of which define "covered services" in a manner that includes health care

---

[7] For ease of reading, we omit herein the capitalization of these and other terms as they appear in the agreements at issue. As MAH's brief states, parties often capitalize contract terms in order to indicate that such terms are intended to have the meaning defined elsewhere in the contract or in some other document to which reference is made.  None of the contracts at issue here expressly so states, nor do the contracts define all of the terms they capitalize.  Nevertheless, where we use a term that is both capitalized and defined by one of the contracts involved here, and that definition is important to understanding the narrow legal question before us, we include the definition.

services provided to "covered persons" under an automobile insurance policy.

Critically, however, the agreements define "covered person" differently. The PPO agreement defines the term to mean "any employee who is entitled to receive covered services under payor programs" (emphasis added). The NAA, in contrast, defines "covered person" more broadly, to mean "any person who is entitled to receive covered services under an automobile medical liability, automobile no-fault, or general liability program" (emphasis added).[8]

Which definition of "covered person" governs? MAH relies on the one found in its PPO agreement with Prime -- the definition that requires a person to be an employee to be a covered person. In MAH's view, Commerce's insureds are not "covered persons" unless they are employees, so Commerce must pay one hundred percent of the amounts MAH charges for services to nonemployee insureds.

Commerce, on the other hand, points to § 8.6 of the PPO agreement (§ 8.6), entitled "Interpretation," which provides, in

---

[8] The MSA-PPO, similarly, defines "covered person" to mean "an individual insured or a claimant under a policy," elsewhere defined to mean an automobile insurance policy issued by a client such as Commerce. For simplicity, however, our discussion focuses on the definition in the NAA, in part because MAH has specifically acknowledged that the NAA creates a "payor program" within the meaning of the PPO agreement. See note 6, supra.

6

its entirety, "In the event of a conflict between the language of this agreement and any payor program, the language of the payor program shall prevail with respect to the terms applicable to that payor program." Commerce argues that, because the NAA constitutes a payor program, see notes 6 and 8, supra, and because the NAA defines "covered person" in a manner that is not limited to employees, the PPO agreement conflicts with the NAA. Thus, the PPO agreement's § 8.6 causes the NAA's broader definition to govern. Under that definition, Commerce is entitled to pay MAH at the ninety-five percent rate for its insureds, regardless of whether they are employees.

Discussion. We construe the PPO agreement according to usual principles of contract interpretation, see Starr v. Fordham, 420 Mass. 178, 190 (1995), including that "no part of the contract is to be disregarded." Id., quoting Boston Elevated Ry. v. Metropolitan Transit Auth., 323 Mass. 562, 569 (1949). "[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties" (quotation and citation omitted). Starr, supra at 192.

MAH's principal argument is that the PPO agreement's narrower definition of covered person is clear and unambiguous. In variations on this theme, MAH asserts that the PPO agreement is a fully-integrated agreement and that, because MAH is not a

7

party to the NAA, which was not executed until long after MAH executed the PPO agreement, MAH cannot be bound by the NAA. MAH concludes that adopting Commerce's interpretation of § 8.6 of the PPO agreement, under which the NAA's broader definition of covered person controls, would impermissibly rewrite the PPO agreement.

We agree with MAH's premises but not its conclusions. The PPO agreement's definition is indeed unambiguous (for present purposes), the PPO agreement is integrated, and MAH is not a party to the later-executed NAA. But MAH's argument fails to reckon with § 8.6, which (1) is just as much a part of the PPO agreement as the definition of covered persons, (2) contains no ambiguity identified by MAH, and (3) must also be given effect. See Starr, 420 Mass. at 190, 192.

1. Effect of § 8.6 in furthering PPO agreement's purposes. The PPO agreement expressly contemplates that Prime would be marketing MAH's services in the future to "PPO clients," such as third-party administrators (like AIS), insurers, or payors (like Commerce). Under the PPO agreement, to create payor programs, Prime would enter into future contracts, the terms of which were not known with certainty at the time. The PPO agreement's second recital states that "[MAH] wishes to contract with Prime . . . to participate in the PPO network and to assist [Prime] in promoting [MAH's] services to [Prime's] clients."

8

Under § 1.19 of the PPO agreement, Prime's clients "will be (1) a third party administrator needing access to a contracted network to use in conjunction with their clients [or] (2) an insurance company who needs access to a healthcare network for their policyholders to access . . . ."  And § 3.1 of the PPO agreement provides, "[Prime] agrees to enter into agreements with payors that include appropriate incentives for covered persons to utilize participating providers such as [MAH] . . . ."[9]

In light of MAH's acknowledgment that obtaining the benefits of the PPO agreement would require payor programs to be established under future contracts, it was entirely rational for MAH to agree in § 8.6 that, in the event of a conflict between the PPO agreement and one of those other contracts, the other contract would control.  See Starr, 420 Mass. at 192 (contract to be construed as rational business instrument to carry out parties' intent).  Notably, the PPO agreement's integration clause, on which MAH relies, provides that the PPO agreement,

---

[9] Similarly, § 3.2 provides that Prime "and/or" its clients "will contract" for "the full range of UR [utilization review] program services"; "[s]ervices selected by payor will be set forth in the payor program"; and "[MAH] agrees to make best efforts to comply with UR program requirements."  In the same vein, under § 3.7, MAH "agrees to make reasonable efforts to comply with . . . those [Prime] and payor protocols, policies and programs as set forth in this agreement or payor manuals or handbooks to be provided by payor."

9

along with any subsequent amendments, "constitutes the entire understanding and agreement of the parties hereto and supersedes any prior written or oral agreement pertaining to the subject matter of this agreement" (emphasis added).  This language does not bar application of the terms of the contemplated future payor programs.  And § 8.6 is part of the "entire understanding and agreement" and expressly makes those later-established terms controlling in the event of a conflict.[10]

We reject MAH's claim that there is no conflict between the terms of the agreements and so § 8.6 is irrelevant here.  The PPO agreement requires a covered person to be an employee; the NAA does not.  The result here would differ depending on which definition applies.  That is a conflict.  Similarly, MAH's observation that the PPO agreement could have omitted the word "employee" from the definition of covered person, but did not do so, is beside the point.  The question before us is not what that definition means, but whether § 8.6 requires that it yield to the later-adopted and conflicting definition in the NAA.

---

[10] Confirming that different mechanisms were available for resolving conflicts with other agreements, § 7.13 of the NAA between Prime and AIS provides, "This agreement references and requires the creation of other agreements, particularly participation agreements, as defined herein.  To the extent that a conflict arises between the provisions of such agreements and this agreement, the provisions of this agreement shall control."  The PPO agreement between MAH and Prime is a "participation agreement" as defined both by § 1.11 of the PPO agreement and by § 1.7 of the NAA.

MAH next contends that it cannot be bound by "essential and material terms of a contract to which [it] has not agreed." Walsh v. Telesector Resources Group, Inc., 40 Mass. App. Ct. 227, 233 (1996). To the contrary, however, MAH did agree, through § 8.6, to be bound by the terms of future contracts to which it would not be a party. Nothing in § 8.6 carves out an exception for conflicts with those terms of the PPO agreement that MAH may deem essential or material. MAH offers no definition, let alone one agreed to by the parties, of which terms might meet those criteria.

No doubt MAH took some risk by agreeing to be bound by terms that did not yet exist and that it might have no role in negotiating. But that risk gave Prime additional flexibility in marketing MAH's services to insurers and third-party administrators, who would send more patients to MAH, or participate in Prime's billing and claims processing system for efficient payments to MAH for patients who obtain treatment there, or both. And the risk MAH took was not unlimited; § 6.1 of the PPO agreement gives MAH the right to terminate the agreement at any time, without cause, on ninety days' notice.

MAH further argues that construing § 8.6 to allow a future agreement's definition of covered services to control over the PPO agreement's definition would render the PPO agreement so uncertain and indefinite, as to a material and essential term,

11

as to render it unenforceable.  MAH relies on the principle that "[a]ll the essential terms of a contract must be definite and certain so that the intention of the parties may be discovered, the nature and extent of their obligations ascertained, and their rights determined."  Cygan v. Megathlin, 326 Mass. 732, 733-734 (1951).

But Cygan itself expressly recognizes that whether any particular term is essential to a contract's enforceability depends on the circumstances:

> "A contract is not to be struck down because one of its material provisions is stated in broad and general terms if, when applied to the transaction and construed in the light of the attending circumstances, the meaning to be attributed to it can be interpreted with reasonable certainty so that the rights and obligations of the parties can be fixed and determined."

Cygan, 326 Mass. at 734.  Thus, case law "has gone far in enforcing contracts where the consideration to be paid by one party to the other was expressed as a fair and equitable share of the profits [or] a sum which would be right and satisfactory," rather than as a strictly mathematical amount or calculation (citations omitted).  Id.  "If parties specify formulae and procedures that, although contingent on future events, provide mechanisms to narrow present uncertainties to rights and obligations, their agreement is binding."  McCarthy v. Tobin, 429 Mass. 84, 87 (1999), quoting Lafayette Place Assocs. v. Boston Redev. Auth., 427 Mass. 509, 518 (1998), cert.

12

denied, 525 U.S. 1177 (1999). "[A] contract embodying all the material factors for the accomplishment of a transaction undertaken by the parties is not incomplete or indefinite because it fails to express in terms some matters concerning the performance of the contract and reasonably necessary for the attainment of its object." Shayeb v. Holland, 321 Mass. 429, 431 (1947).

Here, the category of covered persons to whom MAH was required to provide treatment and accept payment of ninety-five percent of its billed charges was defined by the PPO agreement -- subject to the terms of future payor programs, and further subject to MAH's right to terminate if, among other things, MAH found those future terms unsatisfactory. The PPO agreement defined the types of covered services MAH would render, the compensation it would receive for doing so, and the range of payor programs under which patients would come to MAH -- payors being defined by § 1.12 to include workers' compensation, group health, and "first party auto medical liability," i.e., PIP insurers.

Viewed within those set parameters and the scope of the PPO agreement as a whole, the indeterminacy of the agreement here is narrow. It concerns only the number of PIP insureds treated at MAH for whom MAH must accept ninety-five percent payment from their insurer, here Commerce, by virtue of the insurer's

13

participation in a payor program. MAH contends it is only those PIP insureds who are employees; Commerce contends it includes all of Commerce's PIP insureds, even if not employees. Notably, when MAH entered into the PPO agreement, it could not have known the number of such patients it would treat in either category. And MAH's brief acknowledges that the PPO agreement's definition of covered persons, by referring to employees, limits only the number of patients for whom each insurer could pay at the ninety-five percent rate. It does not limit the number of insurers to which Prime could promote MAH's services. Thus the total number of patients for whom MAH must accept ninety-five percent payment is, even under MAH's interpretation, unknown.

Case law recognizes that a contract need not specify the precise quantity of goods or services to be purchased or sold in order to be enforceable. See, e.g., Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 686-689 (1961) (output contracts); Associated Credit Servs., Inc. v. Worcester, 33 Mass. App. Ct. 92, 93-94 (1992) (requirements contracts). Moreover, where parties have not agreed with respect to a term such as quantity that is essential to a determination of parties' rights and duties, the court will, if possible and equitable, supply a term that is reasonable in the circumstances, in order to yield a contract that is enforceable rather than ineffectual. See

14

Browning-Ferris Indus., Inc. v. Casella Waste Mgt. of Massachusetts, Inc., 79 Mass. App. Ct. 300, 311-313 (2011).

Here, we need not even go so far as to supply a reasonable term. Instead, we need only decide whether to apply the definition of covered services agreed to by MAH in the PPO agreement, or instead the conflicting definition in the NAA. We have no difficulty resolving this conflict by applying § 8.6 of the PPO agreement -- also agreed to by MAH -- to conclude that Commerce's position prevails. Construing the PPO agreement to require MAH to accept ninety-five percent payment for treatment provided to all of Commerce's PIP insureds, rather than only to that subset of Commerce's PIP insureds who are employees, does not render the PPO agreement so indefinite as to be unenforceable.

2. Effect of other provisions on § 8.6. MAH further argues that other provisions of the PPO agreement preclude Commerce's interpretation of § 8.6. First, MAH asserts that when the parties to the PPO agreement (including MAH itself) meant to defer to definitions in payor programs, they said so explicitly. MAH points to the definition of covered services, which includes the phrase "as defined under the payor program," although it is unclear whether that phrase modifies the term "participating providers," the term "services," or some other term. This single provision, however affecting a single defined

15

term, does not make § 8.6 superfluous in resolving potential conflicts between the many other definitions in the PPO agreement (including the definition of covered persons) and those appearing in payor agreements.

Second, MAH points to the nonrecourse provision of the PPO agreement, in which MAH agreed that payments for covered services will come from participating payors and that "under no circumstance, including but not limited to nonpayment," will MAH "have any recourse against[] a covered person (as specifically defined herein)."  MAH argues that this language shows the parties intended the PPO agreement's definition of covered person to govern, even if other agreements might contain conflicting definitions of the term.  Assuming without deciding that MAH's interpretation is correct -- i.e., that the phrase "as specifically defined herein" is intended to negate the application of § 8.6 -- the problem for MAH remains that the phrase appears only in the nonrecourse provision.  It may bar recourse against only those covered persons who are employees, but it does not purport to apply to other provisions, such as the provision stating that "[f]or covered services rendered to a covered person, [MAH] will be paid 95% of the submitted billed charges."

Third, MAH argues that the PPO agreement "requires that Prime give MAH notice of any changes in [p]ayor [p]rograms," and

that because no such notice was given, the terms of the payor programs in which Commerce participates do not control over the terms of the PPO agreement itself. But what the PPO agreement provides in this regard is that "[a]ny payor programs may be amended in any respect by [Prime] at any time by giving thirty (30) days prior notice to [MAH]," and allows MAH thirty days within which to object (emphasis added). MAH has not shown that any relevant payor program in which Commerce participates has been amended.[11] For much the same reason, MAH's reliance on the PPO agreement's requirement that "[a]ny amendment to this agreement must be in writing and signed by both parties" is unavailing. MAH does not point to any purported amendment to the PPO agreement. That § 8.6 of the PPO agreement expressly contemplates that the conflicting terms of later-executed contracts may be binding on MAH does not convert the execution of such contracts into an amendment of the PPO agreement itself.

3. Other issues. MAH's miscellaneous other arguments in support of affirmance are unpersuasive. MAH first asserts that because the copies of the NAA and the MSA-PPO appearing in the record are redacted, we cannot properly interpret those

---

[11] MAH identified the relevant payor program as the NAA, which was executed in 2015; Commerce relies on the MSA-PPO, which was executed in 2012. See notes 6 and 8, supra. MAH points to no amendment by Prime to either agreement.

17

agreements, which requires consideration of all of their provisions. But MAH does not even hint as to how the redacted terms might bear on any issue of interpretation relevant here. Our own review of the context of the redacted provisions suggests that the redactions are not relevant. If MAH had a good-faith basis for believing otherwise, we presume that MAH would have called the redacted provisions to the attention of the District Court, or sought access to unredacted copies to the extent that MAH did not already have them. Nothing in the record suggests that MAH did so.

MAH next asserts in its brief that Commerce was not an intended third-party beneficiary of the NAA. At oral argument, however, MAH stated that that issue was not relevant to this appeal. We therefore decline to resolve it. MAH also claims that the affidavit of Eleanor Thompson submitted by Commerce to the District Court is not relevant. We have not relied on that affidavit in our analysis and thus need not address MAH's objection to it. Finally, MAH asserts that its claims are not barred by issue preclusion. Our analysis does not rely on issue preclusion and so we need not address MAH's objection to its application.

Conclusion. The decisions and orders of the Appellate Division are vacated. The judgments of the District Court are

18

reversed and new judgments shall enter for Commerce Insurance Company on all claims.[12]

So ordered.

By the Court (Meade, Sacks & Hodgens, JJ.[13]),

*Paul Little*

Clerk

Entered:  March 3, 2025.

---

[12] MAH's request for appellate attorney's fees and costs under G. L. c. 90, § 34M, is denied.

[13] The panelists are listed in order of seniority.